## UNITED STATES *v.* CITY AND COUNTY OF SAN FRANCISCO.

No. 587.   Argued March 28, 1940.—Decided April 22, 1940.

---

[10] Cf. *In re Price,* 99 F. 2d 691, 694.

*Assistant Attorney General Littell,* with whom *Solicitor General Biddle,* and *Messrs. William D. Donnelly, Lawrence S. Apsey,* and *Frederic L. Kirgis* were on the brief, for the United States.

*Messrs. Garret W. McEnerney* and *John J. O'Toole,* with whom *Messrs. Dion R. Holm* and *Robert M. Searls* were on the brief, for respondent.

Mr. Justice Black delivered the opinion of the Court.

By the Raker Act of December 19, 1913,[1] Congress granted the City and County of San Francisco,[2] subject to express conditions, certain lands and rights-of-way in the public domain in Yosemite National Park and Stanislaus National Forest. The Act in terms declared that this, known as the "Hetch-Hetchy" grant, was intended for use by the City both in constructing and maintaining a means of supplying water for the domestic purposes of the City and other public bodies, and in establishing a system "for generation and sale and distribution of electric energy."

Upon application of the Secretary of the Interior, the United States brought this suit[3] in equity charging the City with disposing of power through the Pacific Gas & Electric Company, a private utility, in violation of § 6 of the granting Act. Section 6 provides "That the grantee [the City] is prohibited from ever selling or letting to any corporation or individual, except a municipality or a municipal water district or irrigation district, the right to sell or sublet the water or the electric energy sold or given to it or him by the grantee: *Provided*, That the rights hereby granted shall not be sold,

---

[1] c. 4, 38 Stat. 242.

[2] The City and County of San Francisco is a municipal corporation of California and will be referred to here as the City.

[3] Section 9 (u) of the Act contains the following: "*Provided, however*, That the grantee shall at all times comply with and observe on its part all the conditions specified in this Act, and in the event that the same are not reasonably complied with and carried out by the grantee, upon written request of the Secretary of the Interior, it is made the duty of the Attorney General in the name of the United States to commence all necessary suits or proceedings in the proper court having jurisdiction thereof, for the purpose of enforcing and carrying out the provisions of this Act." 38 Stat. 250.

assigned, or transferred to any private person, corporation, or association, and in case of any attempt to so sell, assign, transfer, or convey, this grant shall revert to the Government of the United States."

The District Court concluded that the City was violating § 6 by the sale and distribution of Hetch-Hetchy power through the Pacific Gas & Electric Company, a private utility. Accordingly, the City was required by injunction alternatively to discontinue such disposal of the power or cease further use of the lands and rights granted it under the Act for generation and transmission of electric energy.[4] The Circuit Court of Appeals reversed,[5] finding that the private utility was merely acting as the City's agent in the sale and distribution of Hetch-Hetchy power and holding that § 6 does not prohibit such sale and distribution of that power by a private utility.

Here, as in the courts below, the City has defended the sale and distribution by Pacific Gas & Electric Company of power originating at Hetch-Hetchy upon the grounds that such disposition does not violate the prohibitions of § 6; that imposition of these prohibitions was not within the constitutional authority of Congress; and that if § 6 is valid and has been violated, the United States is not entitled to injunctive relief in equity.

*First. Prohibitions of Section 6.*—In the City's view, § 6 does not preclude private utilities from all participation in the ultimate sale and distribution of Hetch-Hetchy power. The City insists that the Section, so construed, does no more than prohibit the City from selling

---

[4] 23 F. Supp. 40. The District Court stated: "In order that the City may face its problem and comply with its obligations under section 6 of the Raker Act, the court will make its injunction issuable forthwith, but effective six months from the date of its issue." p. 53.

[5] 106 F. 2d 569.

Hetch-Hetchy power to a private utility for resale to consumers and therefore permits consignment of the power to the Company, as agent of the City, for sale and distribution. On the contrary, the Government's position rests upon the claim that Pacific Gas & Electric Company is not in reality selling and distributing Hetch-Hetchy power as consignee and agent but as purchaser for resale; that the grant to the City was made upon the mandatory condition that this power be sold solely and exclusively by the City directly to consumers and without private profit in order to bring it into direct competition with adjacent privately owned utilities; and that § 6 not only withholds the right of selling for resale but also prohibits the City "from ever selling or letting" to any private corporation "the right to sell or sublet the . . . electric energy sold or given to it . . . " by the City. The language of the Act, its background and its history require the construction given § 6 by the Government.

From its provisions,[6] it is apparent that the Act conditions the grant upon and contemplates the development, sale and distribution of electrical power by the City itself "for municipal and commercial use" on a scale to be gradually stepped up over a period of years. "The . . . grantee shall develop and use hydroelectric power for the use of its people and shall . . . sell or supply such power for irrigation, pumping, or other beneficial use." The "right to sell or sublet the . . . electric energy" so generated by the City cannot, as a consequence of § 6, be sold or let. And in case of any attempt to "sell, assign, transfer, or convey [the rights granted], this grant shall revert to the Government of the United States."

From the statement of the Congressman responsible for the application of the prohibitions of § 6 specifically to

---

[6] See § 9 (m).

electric energy,[7] it is clear that as enacted § 6 was understood to prohibit the City from transferring to a private utility the right to sell Hetch-Hetchy power (the Government's contention) and not merely to forbid sale of power as a commodity for resale, as the City would have us hold:

"Mr. TAYLOR of Colorado. We have got to let the municipality sell to individuals or consumers.

"Mr. THOMSON of Illinois. Yes; but not the right to sell some one else the power.

"Mr. TAYLOR of Colorado. Supposing that San Francisco sells a certain block, you may say, of its power to Alameda. Has not Alameda got the right to resell that to its inhabitants?

"Mr. THOMSON of Illinois. Mr. Chairman, in answering the question of the gentleman from Colorado, I would like to call his attention to the fact that the subject of sale as printed in this section is not the power or the water, but the right to sell the power or the water.

". . .

"Mr. RAKER. That [the word "individual"] really is intended to cover any person who might attempt to buy this electric power or right. I think it would cover everybody outside of a corporation, the intention being to prevent anybody getting in and getting a right and sub-letting it."[8]

In its Report on the Bill, the House Committee on Public Lands stated that the provision of § 6 "acquiesced in by the grantee, was designed to prevent any monopoly or private corporation from hereafter obtaining control of the water supply of San Francisco."[9]

---

[7] 50 Cong. Rec., Part 4, p. 3906. Mr. Thomson of Illinois was a member of the committee that considered and reported the Bill.

[8] *Id.*, p. 3999.

[9] H. R. No. 41, 63rd Cong., 1st Sess., p. 11.

From the congressional debates on the passage of the Raker Act can be read a common understanding both on the part of sponsors of the Bill and its opponents that the grant was to be so conditioned as to require municipal performance of the function of supplying Hetch-Hetchy water and electric power directly to the ultimate consumers, and to prohibit sale or distribution of that power and water by any private corporation or individual.[10] On the floor of the House, the following took place between the Bill's author and other Representatives:

"Mr. SUMNERS. Does San Francisco own its own lighting plant now?

"Mr. KAHN. No; it does not.

"Mr. RAKER. I understand it does not.

"Mr. KAHN. It does not own its own water supply. Its present water supply is furnished by a private company.

"Mr. RAKER. The Spring Valley Water System.

"Mr. SUMNERS. Is it the purpose of this bill to have San Francisco supply electric power and water to its own people?

"Mr. RAKER. Yes.

"Mr. SUMNERS. Or to supply these corporations, which will in turn supply the people?

"Mr. RAKER. Under this bill it is to supply its own inhabitants first. . . ."[11]

These views were in accord with the recommendation of the then Secretary of the Interior, as set out in the Report of the Public Lands Committee of the House:

---

[10] Reference to congressional debates may be made to establish a common agreement upon the general purpose of an Act. *Standard Oil Co.* v. *United States*, 221 U. S. 1, 50; *Federal Trade Commission* v. *Raladam Co.*, 283 U. S. 643, 650; *Humphrey's Executor* v. *United States*, 295 U. S. 602, 625.

[11] 50 Cong. Rec., Part 4, p. 3905.

"I think that it is very proper that the Federal Government should use whatever power it has over the public lands, over the parks, and over the forests, to compel the fullest use of these waters, and indirectly to require through its power to make conditions, the lowest possible rate for consumers." [12]

The theme—of an intent to require public utilization of Hetch-Hetchy power independently of private utilities—recurred at a later stage of the debate in the House:

"Mr. GRAY. . . .

"As I understand the bill, it provides for the furnishing of water, and also for power for commercial use. . . .

". . . if these works here are to be contructed to serve the baseness of commercialism, it is the vilest of all vandalism. My suggestion here to you is to strike out of this bill all the commercial profit. . . .

"Mr. KENT [a Member of the California delegation and a supporter of the measure]. Mr. Chairman, I should like to suggest to the gentleman from Indiana [Mr. GRAY] that this bill is strictly drawn in the public interest, that there is no possibility of selfish gain, and that no corporation or individual can obtain any benefit whatsoever from this bill. It is for the benefit of the people of California." [13]

In the Senate, Senator Thomas, a member of the Committee reporting the Bill, said:

". . . San Francisco needs electric power, and California needs development in electric power just as much as she needs ownership in water, . . .

---

[12] House Reports, Vol. 1, Nos. 17–92, 63rd Cong., 1st Sess., 1913, p. 25.

[13] 50 Cong. Rec., Part 4, p. 3991. See also 69 Cong. Rec., Part 9, pp. 9239 *et seq.*

". . . She is anxious to extend her spheres of municipal usefulness, but she is in the grip of a power monopoly as well as that of the Spring Valley Co.

". . . This scheme appeals to me, Mr. President, so far as the power is concerned, because the city of San Francisco as a municipality will be the owner of it, the manufacturer, the distributor of it." [14]

And the words of Senator Norris, also a Member of the reporting Committee and a leading sponsor of the Bill, on the day of its final passage through the Senate, illuminate just what the Raker Act was intended to accomplish:

". . . I said that I was in favor of this bill to a great extent for the reason that it developed this power. This power will come into competition with the various water-power companies of California, and there are lots of them there.

". . . this proposition is to harness that power and to put it to public use not to give it to a private corporation. . . .

"Here is an instance where we are going to give it directly to the people, if we pass this bill. It is going to come into competition with power companies and corporations that have, or will have, if this bill is defeated, almost a monopoly not only in San Francisco but throughout the greater portion of California.

". . .

"These make in all, as I have counted them, 18 corporations controlling the power in the vicinity of San Francisco that are under the control of this one corporation. [Pacific Gas & Electric Company.]

". . . When you sum them all up you will find that they own practically all of the hydroelectric power of the State of California, and this bill, if passed, will bring

---

[14] 51 Cong. Rec., Part 1, pp. 126; 136.

into competition with them one of the greatest units for the development of power that has ever been developed in the history of the world. It means competition.

". . . Conservation does not mean dealing out these resources to private capital for gain. It is not necessary to accuse those corporations of doing any wrong; but here will be an instance where the cheapest power on earth will be developed and where it will be sold at cost." [15]

Opponents of the Bill themselves recognized that its regulatory conditions were designed to insure distribution of power from Hetch-Hetchy through a municipal system in San Francisco. Before final passage in the Senate, opposition had practically narrowed down to the power provisions of the measure,[16] and these provisions contemplated a publicly owned and operated power system.[17]

[15] 51 Cong. Rec., Part 1, pp. 343, 344, 347. Senator Pittman, one of the Bill's sponsors and a Member of the reporting Committee, stated that the Bill provided "absolutely that neither this water nor this power can ever fall into the hands of a monopoly." 50 Cong. Rec., Part 6, p. 5473.

[16] See, e. g., views of Senator Smoot, who opposed the measure: ". . . I was opposed to the regulations that were put in this bill, and that is what I was opposed to more than any other thing. I wanted the question of regulations taken out of the controversy and the bill reported to the Senate without those regulations in it.

". . .

"Mr. President, I do not think there ought to be any misunderstanding about this matter. The Senator himself, I think, will admit that the principal object of this bill is to provide for the creation of power, . . ."

". . . I will, moreover, say that it is my opinion that the reason San Francisco wants this particular dam site is for the power that she thinks can be developed cheaper than from any other source, and at the same time get a large supply of water. That is my personal opinion." 51 Cong. Rec., Part 1, pp. 304, 314, 360.

[17] "The people who ride on street cars, the people who use electric lights, the people who are now using gas, those who eventually will

Immediately before the vote in the Senate, Senator Mc-Cumber, opposed to the power provisions of § 6, offered a sweeping amendment which would have omitted that section and all other provisions relating to the generation, sale and distribution of Hetch-Hetchy power.[18] But his amendment was defeated.[19] And despite this articulate opposition to the policy embodied in its power features, the Act was passed.

To limit the prohibitions of § 6 of the Act narrowly to sales of power for resale without more, as the City asks, would permit evasion and frustration of the purpose of the lawmakers. Congress clearly intended to require—as a condition of its grant—sale and distribution of Hetch-Hetchy power exclusively by San Francisco and municipal agencies directly to consumers in the belief that consumers would thus be afforded power at cheap rates in competition with private power companies, particularly Pacific Gas & Electric Company. It is not the office of the courts to pass upon the justification for that belief or the efficacy of the measures chosen for putting it into effect. Selection of the emphatically expressed purpose embodied in this Act was the appropriate business of the legislative body.

---

use coal for purposes of heat, and those who use water for washing purposes will all receive all the benefit there is in this legislation without any rake-off by any corporation or monopoly." Senator Norris, 51 Cong. Rec., Part 1, p. 347.

[18] Senator Clark, of Wyoming, also opposed to the power provision of the Bill, said with reference to Senator McCumber's amendment: ". . . The Senator from North Dakota [Mr. McCumber] has prepared an amendment to the bill which accomplishes all the purposes which the proponents of the bill claim are desired, leaving out the objectionable features, which have nothing whatever to do with the water supply of the city of San Francisco." 51 Cong. Rec., Part 1, p. 184.

[19] *Id.*, pp. 383, 384, 385.

The admitted facts shown by this record required the District Court to find—as it did—that the City was violating § 6 in permitting sale and distribution of Hetch-Hetchy power by the Pacific Gas & Electric Company. Now, as it has been doing since contracting with the City in 1925, the Company sells and distributes that power as follows:

Power generated in the City's plant is transmitted to the Company at Newark, about thirty-five miles from San Francisco. There the power is delivered to the Company's sub-station and thereafter is under the Company's complete control. The Company distributes and sells this power to its customers in San Francisco and elsewhere exactly as it handles other power which it generates, buys or owns. Consumers of the power are billed by and pay the Company. The City buys Hetch-Hetchy power from the Company exactly as do other consumers. The City receives monthly payments from the Company on a fixed basis set out in the contract. The price received by the City has remained constant from 1925 to date although rates to the consumers have varied in the interim. In the event of the refusal, failure or inability of the Company to take the available output of the City's plant in accordance with the agreement, the amount of energy which the City could have delivered is the basis of making the monthly payment, and the Company must pay for power delivered to it whether actually disposed of by resale or not. The rate paid by consumers for the Hetch-Hetchy power is not fixed by the City, as it could be under the Constitution of California, [20] but is fixed by the State Railroad Commission just as the price of

[20] Under Art. XII, § 23 of the California Constitution municipalities are exempt from rate regulation by the State Commission. See *Pasadena* v. *Railroad Commission,* 183 Cal. 526; 192 P. 25; *Water Users Assn.* v. *Railroad Commission,* 188 Cal. 437; 205 P. 682.

28

all other power sold by the Pacific Gas & Electric Company in California is fixed.

Thus, in brief, the City does not itself distribute and sell the power directly to consumers; it has not provided competition with the private power company; and it has transferred the right to sell and distribute the power to a private power company in violation of the express prohibition of § 6 of the Act.

Terminology of consignment of power, rather than of transfer by sale, and verbal description of the power Company as the City's agent or consignee, are not sufficient to take the actions of the parties under the contract out of § 6. Congress, in effect trustee of public lands for all the people, has by this Act sought to protect and control the disposition of a section of the public domain. The City has in fact followed a course of conduct which Congress, by § 6, has forbidden. Mere words and ingenuity of contractual expression, whatever their effect between the parties, cannot by description make permissible a course of conduct forbidden by law. When we look behind the word description of the arrangement between the City and the power Company to what was actually done, we see that the City has—contrary to the terms of § 6—abdicated its control over the sale and ultimate distribution of Hetch-Hetchy power. There remain only the determinations whether the prohibitions of § 6 are constitutional and can be enforced in equity.

*Second.* The prohibitions of § 6 are challenged by the City as an unconstitutional invasion of the rights of the State of California on the ground that they attempt to regulate the manner in which electricity shall be disposed of in San Francisco. And the City therefore insists that these prohibitions must be considered only as covenants in a contract between the City and the United States. Upon this premise, the City has argued here, as it did in

the Court of Appeals, that alleged equitable defenses render the covenants unenforceable.

When the Raker Bill was before Congress, the City filed with the Public Lands Committee of the House a brief and argument in support of the Bill. Citing authorities, including this Court's opinions, and legislative precedents, the City submitted to Congress that as grantee it would be bound by and as grantor Congress was empowered to impose "the conditions set forth in the Hetch-Hetchy bill." [21] After passage of the Bill the City accepted the grant by formal ordinance, assented to all the conditions contained in the grant, constructed the required power and water facilities, and up to date has utilized the rights, privileges and benefits granted by Congress. Now, the City seeks to retain the benefits of the Act while attacking the constitutionality of one of its important conditions.[22]

Article 4, § 3, Cl. 2 of the Constitution provides that "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory and other Property belonging to the United States." The power over the public land thus entrusted to Congress is without limitations.[23] "And it is not for the courts to say how that trust shall be administered. That is for Con-

---

[21] H. R. No. 41, 63rd Cong., 1st Sess., p. 41. Similar views were entertained in Congress upon the effect of the conditions. See, e. g., Senator Walsh of Montana: "We are making a grant of rights in the public lands to the city of San Francisco, and we may impose just exactly such conditions as we see fit, and San Francisco can take the grant with all those conditions or it can let it alone." 51 Cong. Rec., Part 1, p. 69.

[22] Cf. *Daniels* v. *Tearney*, 102 U. S. 415, 421; *Grand Rapids & Indiana Ry. Co.* v. *Osborn*, 193 U. S. 17, 29; *Wall* v. *Parrot Silver & Copper Co.*, 244 U. S. 407, 411; *St. Louis Co.* v. *Prendergast Co.*, 260 U. S. 469, 473; *Booth Fisheries* v. *Industrial Commission*, 271 U. S. 208, 211.

[23] *United States* v. *Gratiot*, 14 Pet. 526, 537.

30

gress to determine."[24] Thus, Congress may constitutionally limit the disposition of the public domain to a manner consistent with its views of public policy. And the policy to govern disposal of rights to develop hydroelectric power in such public lands may, if Congress chooses, be one designed to avoid monopoly and to bring about a wide-spread distribution of benefits. The statutory requirement that Hetch-Hetchy power be publicly distributed does not represent an exercise of a general control over public policy in a State but instead only an exercise of the complete power which Congress has over particular public property entrusted to it.[25]

*Third.* Finally, on the basis of numerous objections to the District Court's judgment, assigned as errors in the court below and pressed here, the City denies the Government's right—upon a balancing of equities—to relief by injunction even if the present disposition of Hetch-Hetchy power be in violation of the Act.

However, after consideration of all these objections, we are satisfied that this case does not call for a balancing of equities or for the invocation of the generalities of judicial maxims in order to determine whether an injunction should have issued. The City is availing itself of valuable rights and privileges granted by the Government and yet persists in violating the very conditions upon which those benefits were granted. Congress provided "That the grantee [City] shall at all times comply with and observe on its part all the conditions specified in this Act, and in the event that the same are not reasonably complied with and carried out by the grantee, upon written request of the Secretary of the Interior, it is made the duty of the Attorney General in the name of the United

---

[24] *Light* v. *United States*, 220 U. S. 523, 537.

[25] Cf. *Ellis* v. *United States*, 206 U. S. 246, 256; see *Ruddy* v. *Rossi*, 248 U. S. 104.

States to commence all necessary suits or proceedings in the proper court having jurisdiction thereof, for the purpose of enforcing and carrying out the provisions of this Act." Pursuant to this legislative mandate, the present suit was instituted to enforce covenants exacted from a grantee of rights in the public domain by a Congress sympathetic with the local needs of San Francisco but also jealous of its own responsibility to dispose of such rights in a manner deemed by it most likely to render their benefits widespread. The equitable doctrines relied on do not militate against the capacity of a court of equity as a proper forum in which to make a declared policy of Congress effective. Injunction to prohibit continued use—in violation of that policy—of property granted by the United States, and to enforce the grantee's covenants, is both appropriate and necessary.[26]

A substantial part of the City's argument rests upon its claim that the Department of the Interior in the period from 1913 to 1937 construed § 6 to forbid no more than sale of power for resale. We are asked to accept these administrative interpretations. And in addition the City suggests that conduct of the Department, of which these interpretations were a part, is sufficient to create an estoppel against the Government. Whether the Department at any time ever did more than merely to tolerate sale and distribution of Hetch-Hetchy power by the Company as a temporary expedient is doubtful. Certain it is, however, that in 1935 the Secretary of the Interior declared the City's disposition of the power through the Company to be a violation of § 6, demanded discontinuance of this violation without success and thereafter instigated this proceeding. We cannot accept the contention that administrative rulings—such as those here

[26] Cf. *Oregon & California R. Co.* v. *United States*, 238 U. S. 393, 436, 438.

relied on—can thwart the plain purpose of a valid law. As to estoppel, it is enough to repeat that " . . . the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit." [27]

The judgment of the Circuit Court is reversed. The judgment of the District Court is affirmed and we remand the case to it.

*Reversed.*

Mr. Justice McReynolds is of the opinion that the judgment of the Circuit Court of Appeals should be affirmed.

---

[27] *Utah Power & Light Co.* v. *United States,* 243 U. S. 389, 409.