98

Docket 149/249

In the matter of the voluntary dissolution and liquidation of the SIXTH WARD BUILDING AND LOAN ASSOCIATION OF NEWARK, NEW JERSEY.

[Decided October 22d, 1943.]

*Mr. Walter A. Beers,* for objector-shareholder Ruth Motzenbecker.

*Messrs. Mulligan & Koenig,* for the trustees.

BIGELOW, V. C.

Mrs. Motzenbecker excepts to the account of the trustees in dissolution because it shows the Association's liability to her in the sum of $633.25 instead of $1,000.

Exceptant in 1919 subscribed to five shares of installment stock of the Association with a maturity value of $1,000, and

on October 12th, 1932, her shares matured. The Association, however, had at the time no funds available for paying off her shares. Her dues paid amount to $745 and her profits $255. Acting under the emergency statute, *P. L. 1933 p. 94; R. S. Appendix A:7–3*, &c., the Commissioner of Banking and Insurance on March 14th, 1933, issued to the Association order No. 1A, requiring the Association to set up a reserve against foreclosed real estate and mortgages in arrears, the amount of the reserve to be calculated according to a formula contained in the order. The board of directors on March 27th, resolved "that the necessary reserves which have to set set up be recaptured from the surplus or apportioned profits." Accordingly, a reserve of $28,362 was set up, out of profits apportioned, not including, however, profits which had gone into the sum due on matured shares. Exceptant's shares were unaffected; she still appeared on the Association's books as the holder of matured stock of a value of $1,000. On May 23d, the Commissioner issued order No. 3A, directing that the reserve which was required by his prior order, be established from the following sources, and in the order set out:

"(a) From real estate reserves.

"(b) From all other reserves, undivided profits or unapportioned profits.

"(c) From net profits of the current fiscal period.

"(d) From profits previously apportioned. In setting up reserves from this source, the following method shall be used:—The amount of reserves to be set aside from such apportioned profits as compared with the total amount of such apportioned profits shall be calculated on a percentage basis, and such percentage shall then be used in reducing the profits apportioned to the shares of each member.

"(e) If any or all of the reserves set up from the above mentioned sources are insufficient to build up the required reserves, then all classes of shares shall be assessed *pro rata* upon actual payments on shares."

The directors and officers of the Association took no action on this order since they had already created the reserve; but evidently they became doubtful whether some of the reserve should not have been taken from matured shares. In answer to their inquiry, the Commissioner, on July 19th, 1933, wrote:

"If it is necessary to recapture profits apportioned, the shares matured prior to the issuance of the order (of March 14) and not as yet paid out, should also be assessed."

Still no action was taken in this respect by the Association. But the following month, August 9th, 1933, the directors resolved "that an assessment of 10% be made against all stock of this Association and that same be set aside in reserve in accordance with the requirements of the Department of Banking and Insurance." This assessment was intended as a compliance with paragraph (e) of order No. 3A quoted above. Two years later, July 10th, 1935, the directors increased the assessment to 15 per cent. The accounting officers of the Association did not, however, promptly put into effect either of these resolutions of the directors. But on August 13th, 1936, the secretary made book entries by which $62,247 was recaptured from dues and also at the same time $1,860 from profits on matured shares. A sum equal to all the profits which had been apportioned through the years 1919 to 1932, on exceptant's shares, namely, $255, and 15 per cent. of the dues she had paid, $111.75, or a total of $366.75, was charged against her, leaving a credit remaining to her of $633.25. This was the action of which she complains. The Association went into voluntary liquidation in the spring of 1942.

Exceptant argues first that she is a creditor and not a member of the Association; that the directors could no more reduce by resolution the debt due her in order to create a reserve, than they could write down a debt for money loaned. *Cunningham* v. *Mutual Loan and Building Association, 72 N. J. Law 175.* In that suit, after shares had matured, the Association discovered a serious defalcation and insisted that the matured shares bear their proportion of the loss. Our Court of Errors and Appeals affirmed a judgment for the matured amount of the shares, without deduction for the loss. The relation between a stockholder and his association is contractual. When shares become payable in accordance with the terms of the contract, he can enforce payment by the appropriate judicial remedy. In this aspect, occurrences after the debt is fixed, such as the discovery of the embezzlement,

do not constitute a defense. But there is another side to the relation between a shareholder and a building and loan association, which savors of the law of partnership. The shareholder is a "member" of the association, sharing losses as well as profits. His liability for losses is not general or personal, but is a liability to have losses offset against the amount due him on his shares. Chancellor Magie said that when shares mature, the shareholder "is no longer a member but has become a creditor to whom the association is liable for the amount of his matured shares, payable according to the provisions of the constitution." I take it that he could demand performance of his contract whether or not he was a member; but if he were still a member he remained liable in some degree for losses. Since Cunningham ceased to be a member the moment his shares matured, he could not be called on to share the loss.

The law which governed the *Cunningham* Case was changed in several respects by the *Revision of 1903, P. L. 1903, p. 457,* before exceptant subscribed to shares in the Sixth Ward Building and Loan Association. Section 5 declared "when shares mature and are paid, the subscribers thereto or owners thereof, shall cease to be members." Impliedly they remain members until their shares are actually paid, and are subject to the burdens of membership. Exceptant's demand against the Association may be reduced, or offset, by losses or by reserves properly created for anticipated losses. Section 53 of the same statute provided, "All shareholders shall occupy the same relative status as to debts and losses of the association." By sections 38 and 39, every member was given the right to withdraw his shares at will, and if not paid within six months, to enforce payment by suit.

The right of withdrawal so given made the entire capital of these associations payable six months after demand. Most associations could not meet the mass withdrawals which were presented in 1930 and thereafter. For remedy, the legislature established a partial moratorium on the payment first of withdrawals, *P. L. 1932 p. 175,* and then of matured shares, *P. L. 1935 p. 142; R. S. 17:12–53.* These statutes have been sustained as a valid exercise of the police power. *Busci* v.

*Longworth Building and Loan Association, 119 N. J. Law 120; Veix v. Sixth Ward Building and Loan Association, 123 N. J. Law 356; affirmed, 310 U. S. 31; 60 S. C. 792; Sommer v. Workingmen's Building and Loan Association, 125 N. J. Law 83; Veix v. Seneca Building and Loan Association, 126 N. J. Law 314.* The decisions cited do not directly touch the matter before me, since the exceptant is not suing the Association, but is only demanding that the trustees in dissolution recognize in full the liability to her. The precise question goes to the legality of the action of the directors in writing down the liability in order to create a reserve for losses actual or anticipated. The answer is to be found in the statutory provisions for reserves, the orders of the Commissioner made thereunder, and the rank of the obligation of the Association on shares which had matured.

By the emergency act, *P. L. 1933 p. 94; R. S. Appendix A :7–3,* &c., the Commissioner of Banking and Insurance was empowered "to make orders for the purpose of conserving the assets of the building and loan associations of this state * * * whereby * * * to require any and/or all such associations to establish additional reserves or increase present reserves and to regulate any reserves of any and/or all such associations, and to prescribe the manner in which such reserves shall be established." It was pursuant to this authority that the Commissioner issued to the respondent association order No. 1A mentioned above. That order required the reserve to be set up, but left to the discretion of the directors how to create it. They did create it out of profits apportioned to shares not yet matured. Then came order No. 3A of May 23d, of which the pertinent clause is in paragraph (d) directing the reserves to be set up "from profits previously apportioned." It seems to me that this did not require and would not have justified taking profits from matured shares.

The statutes of 1903, 1932 and 1935, *R. S. 17 :12–48* and *53,* undoubtedly brought the status of matured shares and of unmatured shares closer together. While the former class has been cut down, and the latter built up, the position of matured shares still remained superior, at least until the enactment of *P. L. 1935 p. 142.* This was clearly recognized

by Chancelor Campbell in *Busci* v. *Longworth Building and Loan Association, supra,* and by Mr. Justice Heher in *Thirteenth Ward Building and Loan Association* v. *Weissberg, 115 N. J. Eq. 487.* In the latter case, it is said that until maturity, profits apportioned are "paper profits." It has been usual to regard the sums paid for shares by members to the association as the capital, and to consider the profits unapportioned or apportioned to unmatured shares as surplus. So Vice-Chancellor Stein held that when losses necessitate the setting aside of a reserve, it must be taken from profits, until they are all consumed and only then can paid-up shares be called on to contribute. The statutory provision, "All shareholders shall occupy the same relative status as to debts and losses," has application only when capital—as distinguished from surplus or accumulated profits—is impaired. *Newark 21 Building and Loan Association* v. *Zuckerberg, 115 N. J. Eq. 579.* But when installment shares mature, the profits which have been apportioned to those shares coalesce with the dues which have been paid on them and form a single sum, the maturity value, none of which is surplus; it is all a part of the capital of the Association, distributable forthwith. It follows that when the directors of the respondent Association in 1933 set up a reserve against losses, they had first to take all the surplus and profits which had been apportioned to unmatured shares, before they could go against dues paid on such shares, or against matured shares. This they did. Then, all the profits having been exhausted, they properly resolved to take for the reserve a certain percentage of all the stock—the capital—of the Association. In the case of matured shares, assessment should have been calculated on the maturity value. While the order of the Commissioner specified an assessment "upon actual payments on shares," I think the order as well as the resolution of the directors, may be so construed. The result is that the secretary was not justified in recapturing first the profits which had entered into exceptant's shares and then 15 per cent. of the balance. He should have made but one assessment against exceptant, 15 per cent., or $150, of the maturity value of her shares. The trustees will be ordered to adjust the account accordingly.

The act of 1935, which made a considerable change in the law with respect to the creation of reserves, *R. S. 17:12-48*, took effect March 12th, 1935, after the resolution of the directors had been passed which recaptured profits and assessed the stock 10 per cent. but before the adoption of the resolution increasing the assessment to 15 per cent. Since the recapture of profits was lawful when it was made, it will stand, although if it had been made after the statute became operative, it could not be sustained. The capital assessments, as I construe them, were in harmony with the new law as well as the old.