CITY AND COUNTY OF SAN FRAN-CISCO, a municipal corporation, Plaintiff-Appellee,

v.

UNITED AIRLINES et al., Defendants-Appellants,

Department of the Army, Secretary of the Interior, Defendants-Intervenors-Appellants,

TURLOCK IRRIGATION DISTRICT et al., public agencies of the State of California, Plaintiffs-Appellees,

v.

CITY AND COUNTY OF SAN FRAN-CISCO, a municipal corporation, Defendant-Appellant,

Cecil D. Andrus, Secretary of the Interior of the United States, Plaintiff-Intervenor, Appellee.

TURLOCK IRRIGATION DISTRICT, a public agency of the State of California, and Modesto Irrigation District, a public agency of the State of California, Plaintiffs-Appellants,

v.

CITY AND COUNTY OF SAN FRAN-CISCO, a municipal corporation, Defendant-Appellee.

Nos. 77–3826, 77–3827, 78–1778 and 78–2859.

United States Court of Appeals, Ninth Circuit.

Sept. 25, 1979.

Rehearing Denied Nov. 27, 1979.

George A. Sears (argued), Robert M. Westburg, Russell L. Johnson, Jerome Falk, Jr. (argued), San Francisco, Cal., C. Max Vassanelli (argued), Washington, D. C., for Turlock Irrigation Dist., Dept. of the Army et. al., appellees.

McMorris M. Dow, Steven L. Mayer, Howard Prim, Rice Nemerovski, Canady & Pollak, Russell L. Johnson, San Francisco, Cal., C. Max Vassanelli (argued), Washington, D. C., George A. Sears (argued), Gordon E. Davis (argued), San Francisco, Cal., for United Airlines et al., appellants.

Before MERRILL and TRASK, Circuit Judges, and BURNS *, District Judge.

MERRILL, Circuit Judge:

These appeals concern San Francisco's right to establish the rates it charges for power generated at its Hetch Hetchy facility. The specific question is whether the rates it charges must be approved by the Secretary of the Interior under the terms of the Raker Act, 38 Stat. 242 (1913), which granted to San Francisco the rights of way in Yosemite National Park and other public lands necessary to build the Hetch Hetchy water storage and power project. Drawn in question below were rates set and actions taken by San Francisco without having first obtained the Secretary's approval. In Appeal No. 77–3826/3827 (the *Airlines* case) the district court for the Northern District of California held that approval was not required by the Act. In Appeal No. 78–1778 (the *Irrigation District* case) the district court for the Eastern District of California held that approval was required.

### Background

In the teens of this century, San Francisco sought to develop a new, municipal water supply. Hetch Hetchy Valley in Yosemite National Park was the site selected for development. San Francisco required Congressional approval for the project because of its location, and the Raker Act, *supra*, resulted. The Act placed a number of conditions on the rights granted to San Francisco and gave the Interior Secretary broad powers to oversee the project. Along with municipal water development, the Hetch Hetchy project was designed to generate hydroelectric power. The issue in each of these appeals relates to power generated by San Francisco at its Hetch Hetchy project in excess of that needed for municipal purposes or dedicated under certain mandatory provisions of the Raker Act. This surplus power is sold by San Francisco to its tenants at San Francisco International Airport (including appellant Airlines), to Norris Industries, Inc., to the Turlock and Modesto Irrigation Districts and to certain industrial customers. In 1975, and again in 1976 and 1977, the San Francisco Public Utilities Commission (San Francisco PUC) approved rate increases for this electric power, setting rates at levels comparable to those charged by Pacific Gas & Electric Company, a privately owned public utility.

The *Airlines* case was commenced when several airline customers of San Francisco refused to pay the increased charges for electric power. Suit was originally brought by San Francisco in the State Superior Court and thereafter was removed by the airline defendants to the United States District Court for the Northern District of California. The Department of the Army intervened as a real party in interest; the increase in electric rates was applied to Norris Industries, Inc., and, by contract, any increased charges were to be passed through to the Army. The Secretary of the Interior was also permitted to intervene in support of his claim that his approval was required as to any rate increases.

Cross-motions for summary judgment were filed and on September 19, 1977, the District Court entered an order granting partial summary judgment in which it determined that "the increased rates charged by [the City] for electric service . . . are not subject to review by and do not require approval of the Secretary of the Interior." The District Court certified the issue decided under 28 U.S.C. § 1292(b) and this Court allowed the appeal.

The *Irrigation Districts* case was commenced by the districts in March 1977 in the Eastern District of California. The complaint alleged in part that the rates charged by San Francisco for commercial electric power were ineffective since they had not been approved by the Secretary of the Interior. As in the *Airlines* case, the Secretary of the Interior asked for and was granted leave to intervene.

---

* Honorable James M. Burns, United States District Judge for the District of Oregon, sitting by designation.

With respect to the Secretary's claim under the Raker Act, the District Court concluded—contrary to the holding of the Northern District in the *Airlines* case—that under Subsection 9(*o*) of the Raker Act prior approval of the Secretary is required of rate increases initiated by the San Francisco PUC. It entered an injunction restraining San Francisco "from selling or attempting to sell Hetch Hetchy commercial power to any purchaser for rates in excess of those approved by the Secretary." San Francisco has appealed from this judgment.

Subsection 9(*o*) of the Raker Act relates to the rates to be charged for power generated at the facility. That subsection provides in part

"That the rates or charges to be made by the grantee * * * shall at all times *conform to the laws of the State of California* or, in the absence of *any such statutory law*, be subject to the approval of the Secretary of the Interior, and in the absence of such law no rates or charges shall be made, fixed, or collected without such approval * *· *·." (emphasis supplied)

It is the construction of this language with which we are concerned.[1]

*Need for Secretary's Approval*

The question before us is the meaning to be attributed to the phrases "laws of the State of California" and "the absence of any such statutory law." If the rates established by San Francisco conform to the statutory law of California then the Secretary's approval is not required.

When the Raker Act was passed in 1913 it was assumed that under California law the state Railroad Commission (predecessor of the present state Public Utilities Commission) would fix the rates for Hetch Hetchy power. However, in 1920 the Cali-

fornia Supreme Court held that under the state constitution the Commission's power to fix rates was limited to privately owned public utilities and that it had no authority to regulate rates fixed by municipal corporations. *City of Pasadena v. Railroad Commission of California*, 183 Cal. 526, 192 P. 25 (1920).

The San Francisco City Charter, Part 10, § 3.590 *et seq.* establishes a Public Utilities Commission. The Charter authorizes the Commission to fix utility rates and expressly prescribes the procedures which must be followed requiring it to hold public hearings after published notice before adopting or revising any rate schedule, § 3.598. Since 1898 it has been recognized in California that a city charter approved by resolution of the legislature has the force of state law. In *Ex parte Sparks*, 120 Cal. 395, 399, 52 P. 715, 716–17 (1898) the Supreme Court stated:

"It is now expressly provided that the charter may be approved by concurrent resolution, and that then such charter 'shall become the organic law thereof;' that is, it is a special mode for the enactment of a law by the legislature. It is clear that it is made a law by the legislature, and becomes a law by this expression of the sovereign will of the state. It prevails and has force as a law of the state."

This has now been established as constitutional doctrine, for under Article 11, § 3(a) of the state constitution, city charters are given the "force and effect of legislative enactments."[2]

It should be noted that the San Francisco Public Utilities Commission does not have complete control or the final say over the rates for Hetch Hetchy power. The same criteria of reasonableness of rates apply to a municipality as apply to private utilities.

---

1. Section 9(m) also provides for approval of rates by the Secretary where rates are not fixed by state law. That subsection, however, has for some years been superseded by 9(*o*).

2. Municipal utilities have also achieved constitutional status. Article 11, § 9(a) of the California Constitution provides in part that "a

municipal corporation may establish, purchase, and operate public works to furnish its inhabitants with light, water, power, heat, transportation or means of communication. It may furnish those services outside its boundaries * * *"

The rates charged must be "fair, reasonable, just, uniform and nondiscriminatory * * *" 12 McQuillan, Municipal Corporations § 35.37(a), at 483. Rates charged are subject to judicial review. *See, e. g., City and County of San Francisco v. Western Air Lines, Inc.,* 204 Cal.App.2d 105, 22 Cal.Rptr. 216 (1962).

On these bases San Francisco contends that Hetch Hetchy power rates fixed by the City's Public Utilities Commission, subject to judicial review, are fixed under the statute laws of the state and thus need not have the Secretary's approval.

In both appeals San Francisco's adversaries contend, however, that the legislative history of the Raker Act demonstrates that Congress intended the rates charged for the Hetch Hetchy power to be regulated by a state-wide agency or utilities commission. Reference is made to the many instances during the legislative debate when congressmen and senators expressed the view that San Francisco should not be empowered to charge "exorbitant" or "extortionate" rates and of the reassurance that the legislators drew from the existence and rate making authority of California's Railroad Commission. We are thus asked to read the statutory language "laws of the State of California" as limited solely to laws providing for a specific regulatory scheme—one for the fixing of rates by a state Public Utilities Commission. We cannot accept this construction.

First, we rely on the vigorous debate over the propriety of using the Secretary's approval as a means to assure that Hetch Hetchy rates were not excessive. Congress simply did not intend to create dominant federal control over all aspects of the project. As noted by this court in *Starbuck v. City and County of San Francisco,* 556 F.2d 450, 452 (9th Cir. 1977), the Act "creates a delicate balance between federal interests in the use of federal public lands and state interests in the supply and distribution of water and energy to its citizens." We also noted that "state sovereignty versus federal control over public lands was one of the dominant subjects of debate dur-

ing Congressional consideration of the Act." 556 F.2d at 453, n.3.

In the initial bill the Secretary was given exclusive rate setting authority. Senators Borah, McCumber and Walsh vigorously opposed granting the power to set rates to a federal officer, believing such authority belonged to a sovereign state. After several modifications, a bill was drafted employing the language of the Act as passed. Even this language, which cut back the Secretary's power significantly, drew opposition. We find this exchange between Senator Norris supporting the bill and Senator Borah opposing it:

"Mr. NORRIS. Then, assuming further that there is *no law* or that there might come a time when there is *no law* in California fixing the rates, does the Senator think *in an emergency of that kind* there ought to be some provision by which the rates *could not be exorbitant or unreasonable?*

"Mr. BORAH. Yes.

"Mr. NORRIS. Then, under a condition of that kind, *assuming that it should arise,* what objection has the Senator to the balance of the provision which gives the right to the Secretary of the Interior?

"Mr. BORAH. My objection is that in the first place we have no power or authority to send a federal officer into a State to perform one of the sovereign functions of a State—that is, to fix rates." 51 Cong.Rec. 288 (emphasis added)

In response to this objection, Senator Norris sought to assure Senator Borah that the conditions which would trigger the secretarial rate-fixing power were exceedingly limited:

"Mr. NORRIS. I have assumed that the State *has no law.*

* * * * * *

* * * That [condition of an absence of state law] *undoubtedly will never arise,* but for the sake of considering the particular provision, I think it is fair to assume that the condition has arisen. I assume it only for the purpose of considering that proposition." *Id.* (emphasis added)

It would appear then, that the language in question was construed by the bill's supporters as providing a very narrow role for secretarial approval; so long as California maintained a responsible system under law for the fixing of rates the Secretary should not intervene.

Second, the legislative history with reference to 9(*o*) (and also 9(m), see note 1 *supra*), does not stand alone as a guide to legislative intent regarding rate-making. What motivated Congress was not a desire to prevent the City from profiting from rates charged to customers for surplus power; rather Congress was motivated by a desire to provide the people of San Francisco with the advantages of cheap power and City competition with private power companies such as Pacific Gas and Electric. Rate regulation by the Railroad Commission was simply one recognized means to this desired end.

We draw support for our view that Congress was concerned more with the result than the means to it from *United States v. City and County of San Francisco*, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940). That case dealt with a different section of the Act—Section 6, prohibiting sale of power by the City for resale except to municipal power districts. However, the purpose of that section is also relevant to Section 9. The court, with liberal citations from the Congressional Record[3] held that pursuant to the intent to provide cheap power to the people of San Francisco, Section 6 prohibited "assignment" of power by the City to P.G. & E. for delivery to the people of San Francisco. As to this arrangement, the Court noted "the rate paid by consumers for the Hetch-Hetchy power is not fixed by the City, as it could be under the Constitution of California, [it] is fixed by the State Railroad Commission just as the price of all other power sold by the Pacific Gas & Electric Company in California is fixed." 310 U.S. at 27–28, 60 S.Ct. at 755. In a footnote to that passage the court noted that under the state constitution, municipalities are exempt from rate regulation by the State Commission. *Id.* at 27, n.20, 60 S.Ct. at 755. Further, the Court stated "when we look beyond the word description of the arrangement between the City and the power company to what was actually done, we see that the City has—contrary to the terms of § 6—abdicated its control over the sale and ultimate distribution of Hetch-Hetchy power." *Id.* at 28, 60 S.Ct. at 756.

■ We read this language of the Supreme Court as expressing the view that the fixing of rates by the San Francisco Public Utilities Commission rather than by the State Commission not only was permitted under the Act but would more nearly comport with the congressional intent.[4]

We conclude that subject to judicial review as to their reasonableness, rates established by the San Francisco PUC pursuant to the City Charter do "conform to the laws of the State of California" in accordance with Section 9(*o*) of the Raker Act. There is, then, no occasion for securing the approval of the Secretary.

*Irrigation Districts' Appeal No. 78–2859*

■ For some years San Francisco has been supplying power to the Irrigation Districts. By Section 9(*l*) of the Raker Act the Districts were given preferred rights to secure power at cost for certain specified purposes. This appeal presents no question as to power provided under that section.

---

**3.** For example, the Court quoted Congressman Kent: "[T]his bill is strictly drawn in the public interest, that there is no possibility of selfish gain, and that no corporation or individual can obtain any benefit whatsoever from this bill. It is for the benefit of the people of California." 310 U.S. at 23, 60 S.Ct. at 753.

**4.** The expectations of Congress that the people of San Francisco would benefit directly through the purchase of cheap power from the City have not been borne out. While the City does use Hetch Hetchy power for municipal purposes, it has never created or acquired the distribution system that delivery to the residents would require. The people have not thought the cost of such a system was justified by the savings in cost of power and numerous bond issues for the acquisition have been defeated. Accordingly, the people now obtain their power from P.G. & E.

By contract San Francisco also supplied additional power to the Districts as it did to other consumers. The dispute presented here arose when San Francisco notified the Districts that it was going to cease providing Hetch Hetchy power and would instead provide power secured at a higher rate from P.G. & E. The Irrigation Districts by their suit sought to enjoin San Francisco from making this change. Before the district court, San Francisco contended that any rights of the Districts to Hetch Hetchy power other than § 9(*1*) power arose solely by virtue of their contracts with San Francisco; that under these contracts San Francisco had the right to substitute P.G. & E. power; that if the Districts disputed that right the contracts provided that disputes over contract interpretation should go to arbitration. The district court agreed with San Francisco and granted its motion to compel arbitration. The Districts, with the leave of this court, have appealed from that order pursuant to 28 U.S.C. § 1292(b).

The districts rely on Section 10 of the Raker Act which reads "That this grant, so far as it relates to the said irrigation districts, shall be deemed and held to constitute a binding obligation upon said grantee in favor of the said irrigation districts which said districts, or either of them, may judicially enforce in any court of competent jurisdiction."

However, the Act itself gives the Districts no *right* to power—no binding obligation upon San Francisco to provide power—other than § 9(*1*) power. Any right to power in addition to that exists only by virtue of agreement reached between the Irrigation Districts as customers and San Francisco as supplier. As to such rights the contract controls and under its arbitration clause the dispute as to the City's right to terminate the supply of Hetch Hetchy power must first go to arbitration.

In Appeal No. 77–3826/27 (the *Airlines* case) judgment is AFFIRMED.

In Appeal No. 78–1778 (the *Irrigation Districts* case) upon the appeal of the City of San Francisco, the order of the district court is REVERSED.

In Appeal No. 78–2859 upon the appeal of the Irrigation Districts, the district court is AFFIRMED.

On all appeals, the cases are remanded for further proceedings.