**HOUSING AUTHORITY OF ELLIOTT COUNTY; Frontier Housing, Inc., Plaintiffs-Appellants,**

v.

**Bob BERGLAND, individually and in his official capacity as Secretary of U.S. Department of Agriculture; Gordon Cavanaugh, individually and in his official capacity as Administrator, Farmers Home Administration; Daniel Marcus, individually and in his official capacity as General Counsel, U.S. Department of Agriculture, Defendants-Appellees.**

No. 83–5779.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 11, 1984.

Decided Nov. 19, 1984.

Rehearing Denied Jan. 14, 1985.

---

David Flatt, Sandy Hook, Ky., Forrest
Roberts (Lead), Northeast Ky. Legal Ser-

vices, Morehead, Ky., for plaintiffs-appellants.

Keith M. Werhan, Catherine H. Coleman, Washington, D.C., Peter R. Maier (Lead), Robert S. Greenspan, Dept. of Justice, Civ. Div., Washington, D.C., for defendants-appellees.

Before EDWARDS and WELLFORD, Circuit Judges, and WEICK, Senior Circuit Judge.

WELLFORD, Circuit Judge.

Frontier Housing, Inc. ("Frontier") and the Housing Authority of Elliott County, Kentucky ("Authority"), brought suit against the Secretary of Agriculture under § 8401, *et seq.*, which provides housing assistance to "impacted areas" of concentrated mining activity.[1] Attorneys for Frontier and for the Authority joined in an appeal following an adverse decision by the district court and in the joint subsequent brief and reply brief filed by them as appellants in this court. We consider that the posture of Frontier is distinct and separate from that of the Authority, however, and accordingly treat its contentions separately.

Frontier is a non-profit charitable housing corporation which builds houses for low income people in Elliott and three other eastern Kentucky counties. In January 1979 it purchased approximately 13 acres of land for $50,000 in Sandy Hook, Elliott County, Kentucky, with plans to develop this land into thirty-eight building lots. Part of the cost of this contemplated development was to be paid with a grant of $96,560.00 from the Appalachian Regional Commission ("ARC").

In May 1979 Frontier let out bids for the development of the Sandy Hook site. The bids were much higher than Frontier anticipated (about $9,125 per lot); but utilization of the ARC grant lowered the expected cost of developing each lot to about $7,500. This figure was, as set out in appellants' brief, "still too high to feasibly develop the Sandy Hook property and Frontier contemplated abandoning the project and selling the land."

A short time later Frontier's executive director met with representatives of an area development district, of which Elliott County was a part, to encourage the Authority to consider a purchase of the Frontier's property with § 601 funds.[2]

Elliott County, Kentucky, was designated an "impacted area" by the Governor of Kentucky in 1979, and thus became eligible for this federal assistance. Frontier interested the Authority in the proposed housing development and the latter initiated a "pre-application for federal assistance" for § 601 funds, with which it planned to purchase the developed lots from Frontier. It was therein indicated that there was "other related assistance for this project pending or anticipated" but no amount was set out.[3] A grant of $153,750 was sought as the § 601 federal contribution with $51,250 indicated as the applicant contribution (one-fourth of the total). The purpose was narrated to be the "purchase of 28 lots within Frontier Housing Subdivision in Sandy Hook, Kentucky," and the Authority "if awarded the $153,750 requested in this application will purchase 28 developed lots from Frontier...." The Authority made arrangements with a local bank to obtain

1. The Act is styled "Powerplant and Industrial Fuel Act of 1978" and is designed to aid remote coal and uranium mining areas to alleviate demands for housing and public services in contemplated large numbers.

2. The funds might be available under the following statutory language (42 U.S.C. § 8401(a)(1)) if necessary conditions were met, including the following:
   employment in coal or uranium production development activities ... has required or will require substantial increases in housing ... and the State and the local government or

governments serving such area lack the financial resources to meet any such increases in public facilities and services within a reasonable time.

3. The form instructions as to this item included the following:
   show ... the program name, type of assistance, the status and *amount* of each project where there is related pending or anticipated assistance.
   (Emphasis added).

its one-fourth contribution by means of a loan to be repaid from lot sales, but this information was not set out in the pre-application form.

Farmers Home Administration (FmHA) officials (acting as agents for the Department of Agriculture) accepted the pre-application and obligated program funds to ensure that funds would be available for the project should it receive final approval. Later, however, FmHA determined, based on subsequently acquired information, that the grant for the project could not be closed essentially on two separate grounds: (1) relying on the advice of its general counsel in a July 1980 opinion, the Authority's proposal to utilize the proceeds from lot sales to repay in full its bank loans conflicted with a 25 per cent requirement of actual costs contribution from the local government unit, and (2) the Authority was not the type of governmental unit entitled to § 601 funds.[4] In addition, there were conflicting views expressed as to whether the Authority could utilize already fully developed lots for housing sites, especially those in which other government funds or grants were utilized for developmental costs.

### FRONTIER'S STANDING:

■ Appellees moved initially that Frontier be dismissed from the suit because it was ineligible to receive § 601 funds. They rely upon the language of 7 C.F.R. § 1948.54:

> Organizations eligible for grants include local governments, councils of local government, and state governments that have the level [sic] authority necessary to undertake the proposed project.

Frontier has no direct interest in receiving the funds in controversy, and the complaint does not assert that it is an "eligible recipient." The relief sought would clearly enure only to the benefit of the Authority as the applicant. That Frontier may be interested in effectuating its proposed sale of the property, as it has developed that property for housing sites, gives it no di-

rect stake in the controversy nor in the prayer for declaratory judgment. Even if no party in this appeal had raised the issue of Frontier's standing, this court should address that issue initially even on its own motion. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); C. Wright and A. Miller, *Federal Practice and Procedure*, § 1393 (1969 ed.).

The question of plaintiff's standing here is as stated by the Supreme Court in *Warth v. Selden*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975):

> ... whether the ... statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief. (Footnote omitted).

Frontier has no right to judicial relief under the statute. It has suffered no direct, palpable injury from alleged breach of any statutory duty owed it by reason of appellee's actions in interpreting and administering the Act. Nor is Frontier an intended beneficiary under the Act. Frontier's complaint does not fall within the zone of interests protected by the law invoked. *Allen v. Wright*, —— U.S. ——, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984); *see Valley Forge*, 454 U.S. at 474–475, 102 S.Ct. at 759–760. Frontier, therefore, should have been dismissed by the district court because it has no standing to pursue the claim.

### THE 25% REQUIREMENT:

To accomplish its goal of creating new housing, Congress designed under the Act a system of grants, whereby the federal government would shoulder up to three-fourths of the cost of developing a site prior to construction of the housing.

A § 601 grant, by its terms, "may not exceed 75 percent of the costs thereof." *See* § 8401(c)(4)(C). Although the Act does not clarify further the meaning of "costs" it also provides:

---

**4.** This latter position was subsequently changed by appellant FmHA; it now concedes that the

Authority is the type of governmental unit that may be qualified to receive § 601 funds.

Assistance under this section shall be provided only if the Secretary of Agriculture is satisfied that—

    (A) the amounts expended by the State and the local governments involved for the same purposes of which such assistance is provided *will not be reduced;* and

    (B) the amount of such assistance does not reflect any amount for which other Federal financial assistance is provided or on proper application would be provided.

*Id.* § 8401(d)(4) (emphasis added). The FmHA ultimately has construed subsections (c)(4)(C) and (d)(4)(A) as requiring pro-rata division of proceeds from the sale of the land between FmHA and the local government since proceeds from such a sale essentially reduce the cost of a project.[5]

The Authority concedes that its application provided for a lot cost of $7500 each for 28 lots, and that its selling price for the lots "was to be $3000 per lot, the reduction in price being made possible by the $153,-750 § 601 grant." (Appellant's Brief at 3, 4). It further concedes that the proceeds from the lot sales would be used "for the management services provided by Applachian Foothills Housing [a private organization] and to pay off the [Authority] loan, plus interest...." (Appellant's Brief at 4). The Authority initially received encouragement from the FmHA district director that its application would be approved, and act-

ing in reliance on this initial indication of approval, advised Frontier to go forward with site development work, including grading, excavation, drainage, street, sewer and water system work. Frontier proceeded with this development utilizing the $96,560 ARC grant. There was delay attendant to going forward with closing because the Authority was deemed not to be an eligible recipient. (*See* n. 4). There was no final approval of the proposed grant in this case until the closing of the transaction when the grantee was to meet the Secretary's conditions for closing. The Authority was made aware, prior to the potential closing, of a July 1980 opinion of the general counsel for the Department of Agriculture dealing with proceeds from sales of land "acquired or developed through use of Section 601 grants." The opinion stated that "in order to comply with Section 601(c)(4)(C)[6] of the ... Act of 1978 ... proceeds derived from the sale of land acquired or developed through use of a Section 601 grant must be divided between the grantee and FmHA on a pro rata basis." In expanding upon this opinion, the office of the general counsel explained that this particular subsection limited "site acquisition or development grants to a maximum of 75 per cent of the costs thereof," and that when such land was sold "the proceeds derived necessarily reduce the actual project costs," and that any division other than on a pro rata basis would constitute a reduction of the grantee's required minimum 25% contribution.

---

5. On June 26, 1981, the Secretary of Agriculture amended the appropriate regulations, 7 C.F.R. § 1948.90(b)(4), to read:

    Proceeds derived from the sale of land acquired or developed through the use of a grant provided under this subpart must be divided between the grantee and FmHA on a pro rata basis: A grantee may not recover its costs from sale proceeds to the exclusion of FmHA. The amount to be returned to FmHA is to be computed by applying the percentage of FmHA grant participation in the total cost of the project to the proceeds from the sale.

This regulation was amended pursuant to an "emergency" procedure, *see* 5 U.S.C. § 553(b)(3)(B).

    Plaintiffs argue the application of this regulation to the instant case is "tantamount to an *ex*

*post facto* law," and that FmHA and the Secretary should be estopped from denying the funds sought by the Authority by virtue of this **regulation.**

6. As earlier noted, Section 601(c)(4)(C) provides:

    Assistance under this section shall be provided only if the Secretary of Agriculture is satisfied that—(A) the amounts expended by the State and the local governments involved for the same purposes for which such assistance is provided will not be reduced; and (B) the amount of such assistance does not reflect any amount for which other Federal financial assistance is provided or on proper application would be provided.

    42 U.S.C. § 8401(d)(4).

Appellant Authority vigorously contests this interpretation and seeks a closing in accordance with its announced plans to reduce its commitments in the future (by paying off its bank loan) through use of sale proceeds without utilizing any of these proceeds for the benefit of FmHA. The Authority asks this court to declare this interpretation of the Act by appellees to be erroneous and contrary to the purpose of the Act, and/or to declare the appellees estopped from taking this position after the Authority had made plans with Frontier to go forward with the site development based on indications of preliminary approval. After suit was filed by appellant, appellees have taken the additional position that § 601 funds cannot be used to purchase an already developed site, and that use of ARC money for development renders the proposed project ineligible for § 601 funds.[7]

The district court granted appellees' motion for summary judgment after the parties had submitted affidavits and documentary evidence, affirming the recommendation of the Magistrate to this effect after a reference.

■ Interpretation of a statute by a federal agency charged with its administration is entitled to a strong presumption of validity. *New York Department of Social Services v. Dublino*, 413 U.S. 405, 421, 93 S.Ct. 2507, 2516, 37 L.Ed.2d 688 (1973); *Red Lion Broadcasting v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). Appellees' regulation, which was in force when appellants applied for the grant states that grant funds may be used for "up to 75 percent of the *actual cost* of developing or acquiring sites for housing...." 7 C.F.R. § 1948.57(b) (emphasis

added). In effect, appellees construed "actual costs" to mean net cost of any § 601 project, taking into account division of sale proceeds, if any.

■ An agency's construction of its own regulations effectuating a statute is entitled to judicial deference unless it is clearly erroneous. *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Compton v. Tennessee Department of Public Welfare*, 532 F.2d 561, 565 (6th Cir.1976). We cannot find that the FmHA construction is "clearly erroneous," or that the regulations bear no reasonable relationship to the statutory purpose.

■ We do not consider that the government requires its grant to be paid back from sale proceeds; rather, its position is that if the local government unit seeks to reduce its minimum 25% commitment by utilizing land sales proceeds, then it must allow the FmHA to recover its commitments from those proceeds on a 25%–75% pro rata basis. Adoption of plaintiff's rationale would turn the FmHA's 75% statutory ceiling on the contribution of federal funds to a nullity.[8] The Secretary is not, as suggested by appellants, treating the grant as a "loan"; it is attempting only to maintain the statutorily mandated ratio of contribution.

We affirm the grant of summary judgment to appellees based on the appellee's interpretation of the statutory 25% minimum requirement.[9]

**OTHER ISSUES**

In view of our holding that the Secretary's interpretation concerning the 25% minimum requirement as to net costs is not arbitrary and unreasonable, we do not find it necessary to deal with the other issues

---

7. This position is based on 42 U.S.C. § 8401(d)(4)(B) which provides in pertinent part:

   Assistance under this section shall be provided only if the Secretary of Agriculture is satisfied that.... (B) the amount of such assistance does not reflect any amount for which other Federal financial assistance is provided or on proper application would be provided.

8. Appellant's failure to explain this planned disposition of the sale proceeds in their preapplication, application and first and second clarifications thereof suggest that it realized its position was untenable, or unacceptable to FmHA.

9. It is not necessary in reaching this decision to rely on the amended regulation set out in footnote five.

raised except to observe that it would seem illogical in respect to the Act's purpose to use a § 601 grant to purchase an already developed site since this would add nothing to the local government's stock of sites suitable for construction of needed housing. The fact, as contended by appellant, that other local authorities in Kentucky may have been permitted to make less than a "real monetary contribution" of twenty-five percent of the net costs of a § 601 project, is not, in our view, material. The real issue in this case is whether appellees have acted reasonably in respect to the Authority in light of the Act's purposes and requirements. Appellant has shown no basis for application of equitable estoppel against appellees.

■ Equitable estoppel generally is not available against the government. *See, e.g. Schweiker v. Hanson,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981); *INS v. Hibi,* 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973); *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *Utah Power & Light Co. v. United States,* 243 U.S. 389, 408–09, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917). Courts particularly do not favor estoppel when the government is acting in a sovereign rather than proprietary role. This distinction focuses on a concern that government agents, absent the prohibition against estoppel, by their statements or conduct might waive or revise the laws as enacted by Congress. *See Dixon v. United States,* 381 U.S. 68, 73, 85 S.Ct. 1301, 1304, 14 L.Ed.2d 223 (1965); *United States v. San Francisco,* 310 U.S. 16, 31–32, 60 S.Ct. 749, 757, 84 L.Ed. 1050 (1940). Estoppel, if applied in this situation, might permit a misinformed or overly generous government official to give away assets or funds that the government holds for the public good under congressional mandate. *See, e.g., Gressley v. Califano,* 609 F.2d 1265, 1267 (7th Cir.1979); *Leimbach v. Califano,* 596 F.2d 300 (8th Cir.1979); *Goldberg v. Weinberger,* 546 F.2d 477, 480–81 (2d Cir. 1976), *cert. denied sub nom, Goldberg v. Califano,* 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (1977); *Schuster v. Commissioner,* 312 F.2d 311, 317 (9th Cir.1962).

■ In the instant case, the government, in providing grants for the purpose of realizing particular social goals, is acting in its sovereign capacity. Appellant has neither sufficiently alleged nor demonstrated affirmative misconduct in contrast to an alleged mere error of interpretation by appellees. *See United States v. Ruby Co.,* 588 F.2d 697, 701–05 (9th Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979).

Under this rationale, appellant is entitled to no relief on its claim for attorney's fees.

Accordingly, we AFFIRM judgment rendered for appellees for the reasons indicated.