2002 SD 133

**PRAIRIE HILLS WATER AND DEVELOPMENT COMPANY, a South Dakota corporation, Plaintiff and Appellee,**

v.

**Jim GROSS, Scott Gross, Steve Gross, d/b/a JS & S Wood and Iron, and Linda Paulson, Defendants and Appellants.**

No. 22135.

Supreme Court of South Dakota.

Considered on Briefs May 28, 2002.

Decided Nov. 6, 2002.

Randall L. Macy of Buckmaster and Macy Belle Fourche, SD, Attorneys for plaintiff and appellee.

Rod Woodruff, Belle Fourche, SD, Attorney for defendants and appellants.

ZINTER, Justice.

[¶ 1.] Prairie Hills Water and Development Company (Prairie Hills) sued Linda Paulson, Jim Gross, Scott Gross, and Steve Gross (collectively referred to as the Grosses). Prairie Hills alleged that Grosses' commercial sandblasting, painting and other business activities were a public nuisance and were in violation of certain real estate covenants and restrictions in a real estate subdivision. The trial court agreed with Prairie Hills and enjoined Grosses' business operations. The trial court also awarded Prairie Hills attorney fees incurred in enforcing the covenants. Gross-

es appeal both decisions. We affirm the issuance of the injunction. We also affirm that portion of the judgment that awarded attorney fees against the property owners. We reverse that portion of the judgment that awarded attorney fees against non-property owners.

## FACTS AND PROCEDURAL HISTORY

[¶ 2.] Prairie Hills Ranchettes is a real estate subdivision located approximately one mile south of the city of Belle Fourche. Prairie Hills is a non-profit corporation formed to regulate development and other matters within the subdivision. The board of directors of Prairie Hills are property owners in the subdivision.

[¶ 3.] All property in the subdivision was sold subject to covenants and restrictions running with the land. The preamble to the covenants provided that the land in the subdivision was developed "for the purpose of building and *developing for residential use* . . . ." (emphasis added). Covenant # 7 also prohibited "noxious or offensive activit[ies] . . . upon any portions of the . . . property . . .," as well as "anything . . . that will or may become annoying or a nuisance to the surrounding property owners within the subdivision."

[¶ 4.] In 1988, Jim and Linda purchased subdivision Lots 28, 29 and 30. At the time they purchased the lots, Jim was aware that the land was subject to covenants and restrictions running with the property.

[¶ 5.] In 1989, Jim built a building on Lot 29. The building included a living area, a storage area, and work area. In 1991, Jim moved a modular home on Lot 29. In 1997, Jim's sons (Scott and Steve) moved to the property: Scott moved into the living quarters in the building, and Steve moved into the modular home.

[¶ 6.] In 1998, Jim, Scott, and Steve formed a partnership known as JS & S Wood and Iron. This partnership was formed to engage in sandblasting, painting, welding, woodworking, and engine repair. Later that year, Grosses built a sandblasting building on Lot 29, and they obtained a sales tax license for this business.

[¶ 7.] Grosses also began to promote and advertise the business. Their website displayed pictures of belly-dump trucks, buses, a "caterpillar", semi-trucks, and other equipment that had been sandblasted and painted on the property. The website also directed potential customers to drive one and one-half miles through the subdivision to reach Grosses' business.

[¶ 8.] In the spring of 1999, Jim and Susie Casper, neighbors who lived across the street from Grosses, began to complain of noise, dust, and large-vehicle traffic associated with Grosses' business. On May 26, 1999, the Board sent Grosses a letter stating that their business "activity on [the] property may not be consistent with the covenants and restrictions that run with your land." The letter requested an opportunity to address the complaints.

[¶ 9.] On November 4, 1999, the Board followed up by conducting a fact-finding tour at Grosses' business. During the tour, Grosses operated their equipment while the Board made observations at two neighboring residences: the Casper residence and the Lori Wilder residence. The trial court found that it was "very loud" and "very noisy" at both residences.

[¶ 10.] After the fact-finding tour, the Board unsuccessfully attempted to find a way in which the Grosses could continue their business without annoying their neighbors. The Board ultimately concluded that Grosses' "heavy industrial" business was not compatible with the subdivision. Because no compromise was

reached, Prairie Hills instructed Grosses to stop their business activities, move their business, or be sued. Grosses refused and this suit was commenced. The suit alleged that Grosses' business (1) was an annoyance and nuisance in violation of the covenants and restrictions running with the land, and (2) that the business constituted a public nuisance in violation of SDCL 21–10–1.[1]

[¶ 11.] At trial, Caspers testified that they could hear noise from the businesses' back-up alarms, welding machines, grinders, and equipment. Jim Casper testified that the noise was so loud it caused vibrations in his house. He indicated that the noise could be heard in any portion of his house with the windows and doors closed. Lori Wilder also testified that she could hear the noise from Grosses' business inside her house. She additionally expressed concerns about dust and traffic from the large belly-dump trucks. Board member Richard Langer corroborated that the noise heard at Casper's property was "loud and annoying," and that the noise at Wilder's residence was loud even when the windows and doors were closed.

[¶ 12.] Four other property owners also testified. Jeffrey Rutz testified that when he drove past Grosses' business, he could hear compressors running. He described them as "excessively noisy." Rutz also testified that the noise at Casper's house was loud and sounded like "a radio out of tune." Rutz finally indicated that Grosses' business caused concerns about traffic and a possible decrease in the value of his home and the quality of life.

[¶ 13.] Carl Ogaard testified that Grosses' business created too much traffic and junk, created a disturbance, and was not appropriate to be located in Prairie Hills Ranchettes. Brad Schreiber testified that Grosses' business was "not consistent with the residential character" of the subdivision. Both Ogaard and Schreiber indicated that they purchased their property in Prairie Hills Ranchettes because it was a residential subdivision protected by covenants. Only Linda Shuft, the subsequent purchaser of the Wilder home, testified that she did not find the noise from Grosses' business annoying. She was also not concerned about the dust or traffic.

[¶ 14.] Grosses called an expert witness, Dr. Carter Kerk. Dr. Kerk visited the business on two occasions. Although his testimony was generally favorable to Grosses, he did testify that he was able to hear the noise of the air compressor and sandblasting on the property of all neighbors surrounding Grosses' business. Dr. Kerk also failed to perform tests on all noises emanating from Grosses' business, such as the noise created by grinding metal and trucks coming in and out of Grosses' property.

[¶ 15.] A summary of Grosses' commercial business activities in 1999 reflected that Grosses sandblasted and painted six 45–foot belly-dump trailers, eight 30–foot belly-dump trailers, four 16–foot horse trailers, five pickups, and three buses. Sandblasting a 45–foot belly-dump trailer took up to fourteen hours to complete. They sometimes sandblasted the entire day. In these activities, Grosses used over 300 gallons of paint and paint thinner. Grosses also admitted that their goal was to expand the business. Up to the time of trial, Grosses continued to promote their business through newspaper advertising.

[¶ 16.] After hearing this evidence, the trial court found that Grosses were operat-

---

1. SDCL 21–10–1 provides that "[a] nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission ... [a]nnoys, injures, or endangers the comfort, repose, health, or safety of others...."

ing a full-time commercial business. The trial court found that the business activities included sandblasting, painting, grinding, welding and other related activities necessary to carry on large scale commercial sandblasting and painting business. The court also found that Grosses had used the property for the purpose of holding a commercial auction.

[¶ 17.] The trial court ultimately concluded that Grosses' business was inconsistent with residential use and was an annoyance and nuisance to other residential property owners in violation of the covenants and restrictions running with the property. The court also found that the sight, noise, dust, and safety problems created a public nuisance. Grosses were enjoined from operating the business within six months. Based on attorney fee language in Covenant # 11, the trial court also awarded Prairie Hills attorney fees for enforcement of the restrictive covenants.

[¶ 18.] Grosses appeal raising the following issues:

1. Whether Grosses' commercial business violated any residential covenants and restrictions.

2. Whether Grosses' commercial business created a public nuisance.

3. Whether the trial court abused its discretion in granting a permanent injunction.

4. Whether defendant property and non-property owners were liable for the attorney fees incurred in enforcing the covenants and restrictions.

## STANDARD OF REVIEW

[¶ 19.] In reviewing a trial court's decision to grant an injunction we consider "(1) [w]ere any of the facts found by the trial court clearly erroneous? and (2)[i]f not, taking the facts as true, did the court abuse its discretion in granting the injunction?" *Maryhouse, Inc. v. Hamilton*, 473 N.W.2d 472, 474 (S.D.1991). In deciding whether the trial court's factual findings are clearly erroneous, "[t]he question is not whether this court would have made the same findings that the trial court did, but whether on the entire evidence we are left with a definite and firm conviction that a mistake has been committed." *Id.* (citing *Cunningham v. Yankton Clinic PA*, 262 N.W.2d 508, 512 (S.D.1978)). We will not disturb the lower court's findings unless we are satisfied that they are contrary to a clear preponderance of the evidence. *Id.* "The term 'abuse of discretion' refers to a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence." *Dacy v. Gors*, 471 N.W.2d 576, 580 (S.D.1991)(quoting *Gross v. Gross*, 355 N.W.2d 4, 7 (S.D. 1984)). When this Court reviews a matter "involving *judicial discretion* [the test] is 'whether we believe a judicial mind, in view of the law and the circumstances, could reasonably have reached that conclusion.' " *Id.* (quoting *Myron v. Coil*, 82 S.D. 180, 185, 143 N.W.2d 738, 740 (1966))(emphasis and bracketed portion in original).

## DECISION

[¶ 20.] **1. Grosses' commercial business violated the residential covenants and restrictions.**

[¶ 21.] In Conclusion of Law # 5, the trial court concluded that Grosses violated the covenants and restrictions by operating their commercial business within the subdivision. That conclusion was supported by Findings of Fact # 20 and # 26. In Finding of Fact # 20, the trial court found that the Grosses' commercial business conflicted with the residential character of the subdivision. In Finding of Fact # 26, the trial court determined that the

business was "an annoyance and nuisance to other property owners in that their peace and tranquility as property owners within Prairie Hills Ranchettes Subdivision has been unreasonably disturbed."

[¶ 22.] Grosses argue that both findings are clearly erroneous. They attack Finding # 20 because they dispute that the subdivision is "residential," and they contend that their business poses no conflict with the actual character of the subdivision. They argue that the subdivision's real character is "mixed commercial /residential." Grosses attack Finding # 26 because they contend that there was insufficient evidence to show that dust, noise, and traffic unreasonably interfered with the other owners use and enjoyment of their property.[2]

### The Commercial Business Conflicted With The Residential Character of the Development

■ [¶ 23.] Grosses contend that Finding of Fact # 20 is clearly erroneous because they contend that their commercial business is compatible with the subdivision's real character, which they contend is "mixed commercial/residential." In support of this proposition, they first point out that, except for businesses that sell alcoholic beverages, there is no restrictive covenant that explicitly prohibits "businesses."

[¶ 24.] Grosses are correct that the only covenant that *expressly* refers to "businesses" is limited to those businesses that sell alcohol. Grosses, however, overlook the preamble to all of the covenants and restrictions. That section expressly provides that the property was developed for the purpose of residential use: "[the] real estate is divided into lots *for the pur-*

*pose of building and developing for residential use ....*" (emphasis added). Ogaard and Schreiber confirmed this "residential nature" of the subdivision. They indicated that the residential character was part of the reason why they moved to Prairie Hills. They also relied upon the language that provided that the purpose of the subdivision was for residential use.

[¶ 25.] Grosses, however, point out that other commercial businesses (a hair salon, an in-home real estate office, a bee factory, and a retirement home) operate or have previously operated in the subdivision. Although those businesses did operate in the subdivision at some times, the Board had not received a complaint about any other business. More importantly, there was no evidence that any other business generated the level of noise, dust, large vehicle traffic, and annoyance that was generated by Grosses' sandblasting, welding, and painting.

■ [¶ 26.] In considering Grosses' claims that their business is compatible with this residential subdivision, it must be finally remembered that "we regard the real purpose of restrictive covenants contained in a residential subdivision ... as to increase the desirability of [the] lots as residences through the existence of such restrictions." *Piechowski v. Case*, 255 N.W.2d 72, 75 (S.D.1977) (citing *Thodos v. Shirk*, 248 Iowa 172, 79 N.W.2d 733, 738 (1956)). We have also stated "that the real intention of the parties, particularly that of the grantor, should be sought and carried out whenever possible." *Northwestern Pub. Serv. Co. v. Chicago & N.W. Ry. Co.*, 87 S.D. 480, 484, 210 N.W.2d 158, 160 (1973)(citing *Black Hills Power and Light*

---

2. Grosses also devote much of their briefs to their contention that there is insufficient evidence to find that property values have declined in the development as a result of their business. We do not address this argument because a "reduction in property values" was not a factor utilized by the trial court in its findings of fact and conclusions of law.

*Co. v. Schuft,* 86 S.D. 194, 193 N.W.2d 429 (1972)). Here, the intention of the grantor, as clearly stated in the covenants, was that Prairie Hills Ranchettes be developed for "residential use." The trial court found that although the subdivision had allowed some business activity, the subdivision had, with the exception of Grosses' commercial business, maintained its residential character. The trial court's finding regarding the subdivision's residential character was not clearly erroneous.

### The Commercial Business Was An Unreasonable Interference

[¶ 27.] Covenant # 7 provided that "no noxious or offensive activity shall be carried out upon any portions of the . . . property[,] nor shall anything be done thereon or therein that will be or may become *annoying or a nuisance to the surrounding property owners within the subdivision.*" (emphasis added). Grosses argue that there was insufficient evidence to support Finding of Fact # 26 which found that the noise, dust, and traffic produced by the business "unreasonably" interfered with the neighbors' use and enjoyment of their property. *See Aberdeen v. Wellman,* 352 N.W.2d 204, 205 (S.D.1984); *Greer v. City of Lennox,* 79 S.D. 28, 32, 107 N.W.2d 337, 339 (1961).

[¶ 28.] There was, however, testimony from a number of property owners that Grosses' business was offensive, annoying, and a nuisance. Jim Casper objected to the noise, dust, and large vehicle traffic. He testified that the noise caused vibrations in his home and could be heard even when his windows and doors were closed. Wilder also had concerns about the noise, dust and traffic from large belly-dump trucks. Langer confirmed that the noise at Casper's home was "loud and annoying." Langer also testified that the noise in Wilder's residence was loud even when

Wilder's windows and doors were closed. Rutz described the business as "excessively noisy." He also had concerns about the decrease in quality of life and increase in traffic from the business. Others were annoyed by the traffic and did not believe that the business was consistent with the residential character of the subdivision. Considering the totality of the evidence, the trial court was not clearly erroneous in finding that the business was an annoyance and nuisance that "unreasonably" disturbed other property owners in the subdivision.

[¶ 29.] **2. Grosses' business created a public nuisance.**

[¶ 30.] SDCL 21–10–1 provides that "[a] nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission . . . [a]nnoys, injures, or endangers the comfort, repose, health, or safety of others. . . ." SDCL 21–10–3 provides that a public nuisance "affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal."

[¶ 31.] In *Wellman* we stated, "[t]he existence of a nuisance is subject to a rule of reason. It involves the maintenance of a balance between the right to use property and the right to enjoy property unaffected by others' uses." 352 N.W.2d at 205.

> The ultimate question in each cause is whether the challenged use is reasonable in view of all of the surrounding circumstances. Having regard for the needs and methods of defendant, the degree of discomfort and injury occasioned plaintiff in person or in the enjoyment of his property, and the present use and trends of use of surrounding property, if the use made by defendant

is not such as an ordinary man would make, and the resulting discomforts and injuries are not such as people of common sensibilities and tastes should be required to endure, the questioned use is unreasonable.

*Id.* (citing *Johnson v. Drysdale*, 66 S.D. 436, 440, 285 N.W. 301, 304 (1939)). This rule of reason requires that a nuisance must be a condition that "substantially invades and *unreasonably* interferes with another's use, possession, or enjoyment of his land." *Id.* (citing *Greer*, 79 S.D. at 32, 107 N.W.2d at 339) (emphasis added).

■ [¶ 32.] In Conclusion of Law # 6 the trial court held that Grosses created a public nuisance "with sight, noise, dust, and safety concerns produced by their business activities." The court found that these problems unreasonably affected the entire subdivision, even though the extent of that annoyance inflicted upon the individual residents was unequal. Grosses argue that there was insufficient evidence to support a finding of substantial and unreasonable interference sufficient to constitute nuisance.

[¶ 33.] However, as we previously noted in Issue 1, Grosses' business was an annoyance and nuisance to other property owners in that their peace and tranquility as property owners was *unreasonably* disturbed. Grosses' commercial operation involved sandblasting, painting, welding, and related activities in a residential subdivision. Although there was conflicting evidence concerning the extent of the noise,[3] dust, and traffic from large trucks, there was evidence that it was excessive. The finder of fact resolved those differences adversely to Grosses. The trial court's findings regarding a nuisance were not clearly erroneous.

[¶ 34.] 3. **The trial court did not abuse its discretion in granting a permanent injunction.**

■ [¶ 35.] Prairie Hills requested that Grosses be permanently enjoined from conducting their commercial business activities. Grosses counterclaimed for a "compensated injunction" that was limited to abating specific activities found to constitute a nuisance, or alternatively, Grosses sought compensation for the cost of having to move their business. The trial court denied Grosses' counterclaim and granted Prairie Hills' injunction. The trial court's findings and conclusions indicate that its decision was based on findings that irreparable harm would result without the injunction, and that pecuniary compensation would not afford adequate relief. Grosses argue that the trial court abused its discretion in permanently enjoining its business. We disagree.

■ [¶ 36.] SDCL 21–8–14 provides that "a permanent injunction may be granted to prevent the breach of an obligation existing in favor of the applicant: (1)[w]here pecuniary compensation would not afford adequate relief, [or] (2)[w]here it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief...." The ultimate decision "rests in *the discretion of the trial court.*" *Maryhouse*, 473 N.W.2d at 475 (citing *Gross v. Conn. Mut. Life Ins. Co.*, 361 N.W.2d 259, 264 (S.D.1985))(emphasis added).

[¶ 37.] We have adopted four factors to generally consider in exercising that discretion to grant injunctive relief:

1) Did the party to be enjoined cause the damage?

---

**3.** The trial court found that the study performed by Dr. Kerk had some defects and was just one factor in determining whether Grosses' business violated the covenants and restrictions and created a public nuisance.

2) Would irreparable harm result without the injunction because of [a] lack of an adequate and complete remedy at law?

3) Is the party to be enjoined acting in bad faith or is its injury-causing behavior an "innocent mistake"?

4) In balancing the equities, is the "hardship to be suffered by the [enjoined party] ... disproportionate to the ... benefit to be gained by the injured party"?

*Sherburn v. Patterson Farms, Inc.*, 1999 SD 47, ¶ 20, 593 N.W.2d 414, 418 (internal citations omitted); *Harksen v. Peska*, 1998 SD 70, ¶ 24, 581 N.W.2d 170, 174–75; *Maryhouse*, 473 N.W.2d at 475.

[¶ 38.] The trial court expressly found that the first two *Sherburn* factors favored Prairie Hills. Grosses contend that the trial court abused its discretion because it did not make explicit findings balancing the equities under factor four.[4] Jim argues that he could not afford to move the business and that it could cost as much as $230,000 to purchase a new building. Jim argues that the trial court should have entered findings reflecting that it balanced Grosses' hardship against the benefit to be gained by an injunction.

[¶ 39.] Although we generally prefer findings which reflect a balancing of the equities, we have noted that "[e]ven though [an] injunction against full business activity will likely cause economic damage, that factor is not controlling. Whether a use of property creating an alleged nui-

sance is reasonable cannot be gauged solely by the necessities of the users." *Wellman*, 352 N.W.2d at 206 (citing *Johnson v. Drysdale*, 66 S.D. 436, 443, 285 N.W. 301, 305 (1939)). Additionally, in *Union County v. Hoffman*, 512 N.W.2d 168, 171 (S.D. 1994), we acknowledged that "it is within *the province of the trial court* to enjoin all business activities which cause a nuisance, even where the result may be termination of the present use of the property." *Id.* (citing *Wellman*, 352 N.W.2d at 206)(emphasis added). Finally, we note that even though a balancing of interests is generally required, "in some situations the facts and relevant law may indicate that an injunction clearly should be granted or denied" 11A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure, § 2942 at 38–39 (2d ed.1995). For example, in *U.S. v. City and County of San Francisco*, 310 U.S. 16, 30, 60 S.Ct. 749, 757, 84 L.Ed. 1050, 1060 (1940) the United States Supreme Court affirmed an injunction to enforce a land covenant even though there was no balancing of equities. The Supreme Court indicated that it was "satisfied that [the] case [did] not call for a balancing of equities or for the invocation of the generalities of judicial maxims in order to determine whether an injunction should have issued."[5] *Id.*

[¶ 40.] This is a similar case where the trial court's findings justify the issuance of an injunction without further explanation on the balancing of equities. This conclusion is justified by a number of factors. *See, State v. Mark Weaver*, 2002 SD 76, ¶ 25, 648 N.W.2d 355, 365 (stating that although the trial court did not make an explicit consideration of all *Daubert* factors, an express rendering of the trial court's decision-making process is not required where the court's specific findings are supported by the record and further explanation is not required to uphold the order).

---

4. Grosses also argue that the trial court erred in not entering a finding on factor 3. Grosses' argument regarding factor three is without merit. This record clearly shows that Grosses were acting with knowledge of the restrictive covenants. There is no evidence of an innocent mistake.

5. We have also not required an explicit consideration of all factors in other contexts.

First, the trial court did expressly find Grosses' business activities created a public nuisance that "affect[ed] the entire subdivision," and the injury caused by Grosses' business was "irreparable and [could] not be readily, adequately, and completely compensated with money". Second, the facts clearly justified the issuance of an injunction. Jim acknowledged that he purchased the property knowing of covenants and restrictions. Nevertheless, Grosses commenced a commercial sandblasting, painting, grinding, and welding business in the residential development. That business generated large vehicle traffic, dust and noise. Considering the nature of the Grosses' business activity, the residential character of the development, the unsuccessful attempts to reach a compromise, the existence of covenants, and the irreparable injury that could not be adequately compensated by money, the trial court acted within its discretion in granting the injunction.

**[¶ 41.] 4. Property owners were liable for attorney fees incurred in enforcement of the covenants and restrictions.**

[¶ 42.] Generally, attorney fees are only allowed in this jurisdiction when authorized by statute or contract. *O'Connor v. King*, 479 N.W.2d 162, 166 (S.D. 1991). Covenant # 11, provided that "[a]ny property owner violating any of the covenants ... shall be liable and responsible for attorneys fees and costs that may result from the specific enforcement of the ... covenants." The trial court concluded that this covenant constituted an agreement or contract to pay attorney fees. Therefore, the court awarded Prairie Hills the attorney fees it incurred in enforcement of the covenants. There is substantial legal support for the trial court's decision. *See McLain v. Anderson*, 933 P.2d 468, 472–473 (Wyo.1997); *Valenti v. Hopkins*, 324 Or. 324, 926 P.2d 813, 816 (1996); *Donaca v. Ivall*, 44 Or.App. 121, 605 P.2d 709, 714 (1980); *Sheridan v. Martinsen*, 164 Mont. 383, 523 P.2d 1392, 1395 (1974); *Riley v. Boyle*, 6 Ariz.App. 523, 434 P.2d 525, 528 (1967); *Barrows v. Jackson*, 112 Cal.App.2d 534, 247 P.2d 99, 102 (1952); *Ludgate v. Somerville*, 121 Or. 643, 256 P. 1043, 1045 (1927).

[¶ 43.] Grosses, however, first argue that there was no consideration for Covenant # 11 because the public nuisance statute, SDCL 21–10–1, independently prohibited activities that cause a nuisance. Grosses rely on the pre-existing duty rule. Under that rule, the performance of a pre-existing duty cannot form the basis for valid consideration for a contract. *See Garrett v. BankWest*, 459 N.W.2d 833, 841 (S.D.1990)(citing *Dawson v. Corbett*, 71 S.D. 106, 21 N.W.2d 758 (S.D.1946)) and SDCL 53–6–1.

[¶ 44.] However, the covenants and restrictions prohibited more activities than the statutory public nuisances prohibited by SDCL 21–10–1. In addition to the statutory prohibitions, Covenant # 7 also prohibited "noxious or offensive activity," and anything that merely "may become annoying" to the other property owners. The covenants also restricted development for residential use. Therefore, even if there was an independent duty to refrain from conduct constituting a statutory public nuisance, the covenants provided restrictions in addition to those prohibited by the public nuisance statute.

[¶ 45.] Grosses next argue that the attorney fee provision of Covenant # 11 is not enforceable against them because they are not in privity with the

original grantor/developer,[6] and they contend that Covenant # 11 does not run with the land. Grosses' point out that under SDCL 43–12–2(1), only covenants made for the "direct benefit of the property" run with the land. Grosses contend that under the common law, the obligation to pay money for attorney fees is not for the "direct benefit of the property". Rather, it is a "personal obligation" that does not "touch and concern the land." Grosses point to a number of authorities holding that such covenants to pay money do not "touch and concern" the land, and therefore, they do not run with the land.[7]

[¶ 46.] Grosses' reliance on these cases from other jurisdictions is misplaced because they fail to consider SDCL 43–12–2. That statute contains four categories of covenants that run with the land, two of which are relevant here. The first provision, SDCL 43–12–2(1), involves the traditional common law covenants that are "made for the direct benefit of the property," and therefore are the type that "touch and concern the land." SDCL 43–12–2(4), however, also includes covenants that are merely "incidental" to the other covenants that are made for the direct benefit of the property. Under SDCL 43–12–2, the two

relevant covenants that run with the land are:

(1) Those made for the direct benefit of the property or some part of it, then in existence;

(2) . . .

(3) . . . ; and

(4) All covenants *incidental to* any of the foregoing covenants.

SDCL 43–12–2 (emphasis added).

[¶ 47.] In this case, there is no dispute that the residential use and annoyance covenants are the type that directly benefit the land, and therefore, run with the land under subdivision (1). Unlike Grosses authorities, however, subdivision (4) provides that "incidental" covenants also run with the land. Because Covenant # 11 provides for the enforcement of the covenants that are made for the direct benefit of the land, Covenant # 11 is incidental to other covenants. Because Covenant # 11 is incidental to a covenant that runs with the land, Covenant # 11 also runs with the land. SDCL 43–12–2(4). Because Covenant # 11 runs with the land, its attorney fee provision is enforceable against subsequent grantees like Jim Gross and Linda

---

**6.** The record reflects that original developer and grantor was Darrell J. Nickelson.

**7.** *See Paloma Investment Limited Partnership v. Jenkins*, 194 Ariz. 133, 978 P.2d 110 (App.1998)(covenant's attorney fee provision did not "touch and concern" the land, and therefore, based on common law principles, did not run with the land); *White v. Wilhelm*, 34 Wash.App. 763, 665 P.2d 407 (1983) (plaintiff limited only to attorney fees incurred in pretrial efforts to dissolve injunction, court did not address issue of whether right to attorney fees were included in covenant running with the land); *Eagle Enterprises, Inc. v. Gross*, 39 N.Y.2d 505, 384 N.Y.S.2d 717, 349 N.E.2d 816 (1976)(landowner's obligation to purchase seasonal supply of water from grantor was a personal, contractual promise rather than an interest running with

the land); *Raintree Corporation v. Rowe*, 38 N.C.App. 664, 248 S.E.2d 904 (N.C.App.1978)(covenant to be member of country club and pay country club dues was in no way connected to the land, and was therefore, based on common law, a personal covenant rather than covenant running with the land); *Choisser v. Eyman*, 22 Ariz.App. 587, 529 P.2d 741 (1974)(refund rights under water extension agreement was personal right, and under common law could not, by definition, be a covenant running with the land); *Latses et al v. Nick Floor, Inc.*, 99 Utah 214, 104 P.2d 619 (1940)(in unlawful detainer action, agreement to pay attorney fees was a personal covenant between parties of contract and therefore did not run with the land under common law principles).

Paulson, even though they are not in privity with the original grantor.

[¶ 48.] We do, however, agree with Grosses' final contention that even if Covenant # 11 permits recovery of attorney fees, its express terms only subject the "owner" of the property to payment of attorney fees. Because the attorney fee award entered by the trial court applied to *all* defendants, including some who were not property owners, that portion of the judgment is reversed and remanded so that the attorney fee obligation will only be imposed against the property owners—Jim Gross and Linda Paulson.

[¶ 49.] Prairie Hills and Grosses have both submitted motions for appellate attorney fees in this Court. Under SDCL 15-26A-87.3, appellate attorney fees may be granted in actions where such fees are allowable. *In re Guardianship of T.L.R.*, 2002 SD 54, ¶ 19, 645 N.W.2d 246, 251. We have considered both applications. Considering the covenants, Grosses' motion is denied, and Prairie Hills's motion is granted against Jim Gross and Linda Paulson in the amount of $3,000.

[¶ 50.] The judgment issuing the injunction is affirmed. That portion of the judgment awarding attorney fees against property owners Jim Gross and Linda Paulson is affirmed. That portion of the judgment awarding attorney fees against non-property owners is reversed.

[¶ 51.] GILBERTSON, Chief Justice, and SABERS and KONENKAMP, Justices, and AMUNDSON, Retired Justice, concur.