2004 SD 79

**BROOKSIDE TOWNHOUSE ASSOCI-ATION, an unincorporated association, Plaintiff and Appellee,**

v.

**Oliver CLARIN and Inez Clarin, Defendants and Appellants.**

No. 22969.

Supreme Court of South Dakota.

Argued April 29, 2003.

Decided June 16, 2004.

Thomas E. Brady of Brady Plumier, P.C., Spearfish, South Dakota, Attorneys for plaintiff and appellee.

David L. Claggett, Spearfish, South Dakota, Attorney for defendant and appellant.

ZINTER, Justice.

[¶ 1.] Brookside Townhouse Association sought a mandatory injunction against Oliver and Inez Clarin after they installed non-approved windows and siding on their townhome. Clarins counterclaimed for damages. The trial court bifurcated the equitable relief sought in the complaint from the legal relief sought in the counterclaim. After conducting a court trial on the equitable issues, the court granted the injunction and determined that its ruling mooted the legal issues. Clarins appeal, and we affirm.

Facts and Procedural History

[¶ 2.] Brookside Townhouse Association is an unincorporated residential devel-opment association. The Association is comprised of the owners of the residential structures located on the north and south sides of Washington Street in Spearfish, South Dakota. There are forty-two house-hold units in these structures. Twenty units are in five ranch-style four-plexes on the north side of the street. These four-plexes have vertical, brown fir siding with pewter gutters and windows. Eighteen units are in six structures on the south side of the street. Two of those structures are ranch-style three-plexes, and three are ranch-style four-plexes. Those five struc-tures all have vertical, brown fir siding with white gutters and windows. The re-maining structure on the south side of Washington Street is a two-story four-plex with horizontal, lighter colored steel sid-ing.

[¶ 3.] In 1998, Oliver and Inez Clarin purchased a unit in a four-plex on the north side of the street. The purchase was subject to the Association's Declara-tion of Covenants, Conditions and Restric-tions, which required unit owners to sub-mit written plans and specifications to the Association's Board for approval prior to making exterior changes or alterations. In 2000, a committee of owners revised the Association's By–Laws and Declaration of Covenants. Inez Clarin served on that committee. The relevant section of the amended covenant also required prior written approval of the Board before mak-ing external changes. It further required that the Board determine whether exterior changes were in "harmony or external de-sign and location in relation to surrounding structures and topography."[1] There is no

---

1. The covenant provided:
No building, fence, wall or other structure shall be commenced, erected or maintained upon the property nor shall any exterior addition to or change or alteration therein

be made until the plans and specifications showing the nature, kind, shape, color, height, materials and locations of the same shall have been submitted in person and in writing to the Board. Such plans and spec-

dispute that Clarins were subject to this covenant.

[¶ 4.] During the summer of 2000, two events caused Clarins to decide to replace their windows and siding. First, a hail-storm caused damage to their windows, as well as the windows in several units in the development. Second, Clarins claimed that their unit was drafty, which exacerbated Oliver's health condition. Clarins claimed that as result of these problems, they ordered replacement windows. They also decided to replace their siding with light-colored, horizontal steel siding. However, they failed to submit their plans and specifications to the Board as required by the covenant.

[¶ 5.] Inez first contacted the President of the Board in September 2001 to request permission to make the changes. Clarins followed this contact with a letter to the Board on November 3, 2001. Although Clarins' four-plex had vertical, brown fir siding and pewter windows, Clarins' letter requested the installation of white windows and horizontal light-colored steel siding. The photographs in evidence reflect that Clarins' proposed windows did not conform to the color and appearance of the street-side windows in any of the four-plexes on their side of the street. Their steel siding was substantially different from all but one structure on both sides of the street. Nevertheless, Clarins believed that their changes in color and building materials were more "practical," and that others should change their exteriors to conform to Clarins' proposal. They wrote:

ifications shall be judged by the Board as to harmony or external design and location in relation to surrounding structures and topography. The Board of Directors shall respond with a written reply within ten (10) days. (In the event that the Board fails to approve or disapprove such design and location within ten (10) days after said plans

It was my understanding after the June 2001 meeting that the windows on the north side that had hail damage in Aug. 2000 were to be replaced. It is now Nov. 3, 2001, and as far as we know, there has been no window work done. These are very cheap windows and we have had them repaired once, but the vinyl edge is loose again. We have a very loud whistle in the house when we have a strong wind, so we plan to replace all of ours. We also want good windows, so have ordered Pella windows on Oct. 4, 2001. They cannot be returned, so please let us have them installed when they come this following week before the weather gets too cold. If there is an objection to the white color, perhaps the windows on the south side of the street should have theirs painted brown as this street had brown first. I believe that when further work is required on these town houses, that the east end of this street will be planning on white too, as there is no fading and they will look nice much longer. We think it is practical. Also there are some windows on the north side of this street with white already[2] and these have been in for some time.

Also. Please allow us to install steel siding after the windows are in. The window representative told us the siding on our house is in such poor condition that moisture coming in could cause damage to the new windows. We want to use the same siding that would be used in the unit east of us or the same as the one that already has steel siding

and specifications have been submitted to it, approval will not be required and this provision shall be deemed to have been fully complied with.)

2. The only white windows were on the back of said homes. Those windows did not face the street.

across the street. We would like to get this work completed before the weather gets too bad this fall. We would appreciate permission to having our windows installed right away and the siding on before the weather gets too cold. We do want to keep our home in good repair. Since our unit was the second unit built on this street, and the siding was of very poor quality, we feel there should be no objection to getting the repair work done as soon as possible.

[¶ 6.] At a meeting on November 5, 2001, the Board considered the Clarins' white window proposal as well as a similar proposal from another resident. The Board denied both requests. The Board also discussed Clarins' proposal to install the steel siding. Because the Board was in the process of developing a long-term siding plan for the entire Association, Clarins' request for steel siding was also denied.

[¶ 7.] In a November 6, 2001 letter, the Board formally informed Clarins of its decision. The letter also informed Clarins of the Board's ongoing planning for replacement siding throughout the development. The letter finally informed Clarins that the insurance proceeds for the hail-damaged windows had arrived, and that the Board was seeking a contractor to replace the damaged windows.

[¶ 8.] On January 17, 2002, the Board informed Clarins and other residents that it had selected a contractor. The contractor suggested that those who had already ordered white windows could be brought into compliance by painting them the pewter color found on the other homes. Clarins, however, declined to follow that suggestion. Instead, they installed white windows in February 2002, and refused to paint them a conforming color.

[¶ 9.] On May 21, 2002, the Board met with Clarins to discuss the covenant violation and the non-compliant windows. After the meeting, Gary Reimnitz, President of the Board, sent the following letter to Clarins:

Dear Inez and Oliver:

At the monthly board meeting on May 21, 2002 you were asked by the board of your intention to conform to Brookside Townhouse Covenants regarding the window color of the recently installed windows on your unit. The windows were installed without the proper procedure of gaining permission from the Board and of an appropriate color selection.

With the encouragement of association members in attendance at the meeting[,] the Board has set a deadline of June 1 for your written response to the board. Your written response should clearly indicate whether you intend to conform to the covenarrces [sic] and will have the window painted (with proper maintenance done around the framing) or whether the Association attorney should proceed with legal further steps. Again those steps are outlined in the covenants.

Please remember that the window issue on your unit has generated high legal costs to ALL your neighbors and homeowners on the street as you heard reported at the meeting. It is the monthly dues from all Washington Street homeowners that are paying the legal fees for this situation. Such costs diminish funds, which provide improvements for all homeowners.

As you heard at the meeting, homeowners are concerned about the market value of their homes because of this window appearance and lack of covenant conformity. Association members and the Board are anxious to have this issue settled so life can go on for the good of all in the Association. The window issue

is currently holding up other projects, too, that need to be resolved and proceeded with in the interest of all homeowners.

The Board and Association membership looks forward to your response on or by June 1. Thank you for your prompt attention to this matter.

[¶ 10.] Clarins did not respond to this letter. Furthermore, they proceeded to order the horizontal, light-colored steel siding. That siding was delivered to Clarins' home on July 30, 2002. That same day, the Board became aware of the delivery of the steel siding, and it advised Clarins in writing to not proceed with the installation. The letter also advised that if Clarins did install the steel siding, they did so at the risk of being compelled to remove it. Nevertheless, Clarins began installation the next day, July 31, 2002.

[¶ 11.] The association commenced this action for equitable relief that same day. Clarins answered, asserted affirmative defenses and a counterclaim for damages, and requested a jury trial on their legal theories. The trial court bifurcated the claims and first considered the equitable issues. After a court trial on the equitable issues, the trial court granted the mandatory injunction. It further ruled that the "resolution and disposition of the equitable issues in [the] case moot[ed] issues of law, if any, and obviate[d] the need for jury trial of Clarins' Counterclaim."

[¶ 12.] Clarins appeal, raising numerous issues, which we have restated as follows:

1. Whether the trial court erred in denying Clarins' right to a jury trial on their legal claims.
2. Whether the trial court erred in granting a mandatory injunction requiring Clarins to bring their townhome into conformity with the other homes.
3. Whether the trial court erred in including witness fees and costs for a former Association president who testified at trial.

### Analysis and Decision

**[¶ 13.] 1. Whether the trial court erred in denying Clarins' right to a jury trial on their legal claims.**

[¶ 14.] Clarins argue that they were deprived of their right to a jury trial on their counterclaim for breach of fiduciary duty, conversion, breach of covenants, and fraud and deceit.[3] Association agrees that the legal claims "carry a right to jury trial." However, Association points out that Clarins' legal claims were premised on theories that were decided adversely to them in the equitable proceeding. Therefore, Association contends that there was no merit to any of the remaining legal claims as a matter of law. We agree.

[¶ 15.] We have previously held that "[i]n cases where the pleadings seek equitable relief or the legal relief is incidental, a jury trial is a matter for the trial court's discretion." *Skoglund v. Staab*, 312 N.W.2d 29, 30 (S.D.1981) (citations omitted). "Conversely, when the action is at law, either party has a right to a jury trial." First Western Bank, *Sturgis v. Livestock Yards Co.*, 466 N.W.2d 853, 856

---

**3.** Clarins also argue that "a jury trial should be granted within the discretion of the trial court." However, "[a]s a threshold ... [Clarins] must cite relevant authority before this Court will consider granting relief." *State v. Corey*, 2001 SD 53, ¶ 19, 624 N.W.2d 841, 845

(citing *State v. Pellegrino*, 1998 SD 39, ¶ 22, 577 N.W.2d 590, 599). Clarins fail to cite any authority supporting a right to a discretionary jury under the facts of this case. Therefore, that argument is waived.

(S.D.1991) (quoting *Nizielski v. Tvinnereim*, 453 N.W.2d 831, 832–33 (S.D.1990)). In cases involving both claims for relief, a trial court may bifurcate "the equitable issues for a trial to the court, and the legal claims for a trial by jury[.]" *Durkee v. Van Well*, 2002 SD 150, ¶ 11, 654 N.W.2d 807, 812.

[¶ 16.] Following bifurcation and a trial of the equitable issues, a court may also, under certain circumstances, dismiss the legal claims. In *Bachand v. Walker*, 455 N.W.2d 851 (S.D.1990), Bachand argued that he was entitled to a jury trial on a fraud and conversion claim after the court had tried an equitable accounting claim. *Id.* We held that "the trial court was correct in concluding all claims of Bachand had been fully resolved by the [equitable] accounting, and [the court did not err] in refusing to allow a jury trial on the various alleged fraud claims." *Id.* at 854. Clarins, however, argue that *Bachand* is distinguishable because Clarins "are not asking for [an] accounting." However, that argument is misplaced because the *form* of equitable relief is not relevant. The relevant fact is that both Association's claim for an injunction and the *Bachand* claim for an accounting were claims for equitable relief. Therefore, *Bachand* stands for the proposition that if the disposition of the equitable claim resolves the legal claims as a matter of law, a dismissal of the legal claims does not violate the right to a jury trial.

[¶ 17.] Here, the equitable issue resolved the legal claims as a matter of law. Clarins' counterclaims were all premised on allegations of wrongful conduct by the Association in enforcing the covenant and handling the insurance proceeds designated for replacement windows. However, the equitable proceeding determined that Clarins' installation of the windows and siding violated the Association's covenants and that Clarins' defenses were without merit. Moreover, the insurance proceeds were not wrongfully converted.[4] They were merely being held by the Association for Clarins until the hail-damaged windows were properly replaced. Because the equitable ruling necessarily rejected Clarins' legal claims as a matter of law, there was no legal defense[5] or counterclaim remaining for trial by jury.[6]

[¶ 18.] **2. Whether the trial court erred in granting a mandatory injunction requiring Clarins to bring their townhome into conformity with the other homes.**

[¶ 19.] The trial court issued a mandatory injunction requiring Clarins to remove and correct the non-compliant windows and siding, and to replace them with windows and siding of the same material and color as the units adjoining Clarins' home. Our standard of review in equitable actions is abuse of discretion. *Englehart v. Larson*, 1997 SD 84, ¶ 12, 566 N.W.2d 152, 155. Generally, four factors are applied in exercising that discretion.

---

4. Clarins assert that "[n]o genuine issue of material fact exists[,]" and argue that they are entitled to "immediate payment" of the insurance proceeds. However, Clarins have failed to cite any authority for their assertions. Therefore, the issue is waived. *See supra* n3.

5. Clarins only asserted equitable defenses to injunctive relief. *See infra* ¶ 31.

6. Clarins' reply brief raises new issues and new facts supporting a claimed right to jury trial on their conversion and breach of covenant claims. These new submissions violate SDCL 15–26A–62. That statute provides that a reply brief "must be confined to new matter raised in the brief of the appellee[.]" *See, e.g., State v. Beck*, 2000 SD 141, ¶ 25, 619 N.W.2d 247, 254 (Gilbertson, J., dissenting). Because the new issues and facts were not raised in appellee's brief, we decline to address them.

*Prairie Hills Water and Dev. Co. v. Gross,* 2002 SD 133, ¶ 37, 653 N.W.2d 745, 753. Those factors are:

1) Did the party to be enjoined cause the damage?

2) Would irreparable harm result without the injunction because of [a] lack of an adequate and complete remedy at law?

3) Is the party to be enjoined acting in bad faith or is its injury-causing behavior an "innocent mistake"?

4) In balancing the equities, is the "hardship to be suffered by the [enjoined party] . . . disproportionate to the . . . benefit to be gained by the injured party"?

*Id.* at 753–54 (brackets in original) (citations omitted).

### Causation

■ [¶ 20.] Clarins challenge the trial court's finding that they caused damage to another person by installing windows and siding in violation of the covenants. However, we agree with Association that factually, "[t]he very essence of a townhouse development such as Brookside includes uniformity of appearance in order to preserve the overall appearance and value of all the units." Moreover, as a result of the covenant violation, Clarins' home now has light-colored, horizontal steel siding and white windows, while the other three units in their four-plex, and the rest of the structures on that side of the street, have vertical brown fir siding and pewter windows. Consequently, Clarins' unilateral decision to install a non-conforming exterior has caused a lack of uniformity of appearance in the development. Furthermore, that non-uniformity of appearance is damaging to all homeowners in the Association.

[¶ 21.] Clarins also attempt to distinguish our prior decisions in this area on facts that are not material to their holdings. As just one example, in *Vaughn v. Eggleston,* 334 N.W.2d 870 (S.D.1983), we affirmed a mandatory injunction requiring the removal of a mobile home that had been placed in a subdivision in violation of applicable covenants. Clarins, however, point out that *Vaughn* involved substandard housing. They argue that because of their home is not *substandard,* the case is inapplicable. We disagree with Clarins' analysis of *Vaughn,* as well as our other relevant cases[7] because they did not turn on such minor factual details. Rather, our cases enforcing covenants have been based upon the legal notion that property uses that conflict with the property's restrictive covenants may be enjoined. We therefore agree with the trial court that under the facts and the law, Clarins' breach of the covenant caused actionable damage.

### Irreparable Harm

[¶ 22.] The trial court found that Brookside lacked an adequate and complete remedy at law for the injury it suffered. On appeal, Clarins argue that the Board failed to establish that it suffered irreparable harm. Clarins insist that their violations, if any, were "de minimis."

■ [¶ 23.] However, we have previously held that "[g]iven the purpose of . . . covenants to maintain the desired tone of the land, to prevent nuisances, and to secure the attractiveness of the land, even a 'minor' violation of the covenants could be irreparable." *Harksen v. Peska,* 1998 SD 70, ¶ 26, 581 N.W.2d 170, 175. Moreover, we have reviewed the evidence, and Cla-

---

7. *See also Prairie Hills Water & Dev. Co.,* 2002 SD 133, 653 N.W.2d 745; *Harksen,* 1998 SD 70, 581 N.W.2d 170; *Spring Brook Acres Wa-* *ter Users Ass'n, Inc. v. George,* 505 N.W.2d 778 (S.D.1993); *Hammerquist v. Warburton,* 458 N.W.2d 773 (S.D.1990).

rins' new exterior can hardly be described as a "de minimis violation." Clarins' light-colored, horizontal steel siding and white windows stand in stark contrast to the brown fir, vertical siding and dark windows on virtually all of the other structures in the development. Therefore, we affirm the trial court's finding that Association "lacks an adequate and complete remedy at law for the injury it has suffered by reason of Clarins' violation of the Covenants[.]"

### Willful, Knowing and Bad Faith violation or "Innocent Mistake"

[¶ 24.] Clarins challenge the trial court's finding and conclusion that they acted willfully, knowingly, and in bad faith. The court entered this finding and conclusion after two days of testimony from Association Board members, other homeowners in the Association, and Inez Clarin.

[¶ 25.] In challenging this finding and related conclusion, Clarins argue that Inez "believed that what she was doing was proper and necessary for the protection of her husband." They assert that the condition of their previous windows and siding was so poor that their home was drafty, which exacerbated Oliver's medical condition. Clarins further assert that the Association President gave Inez permission to use the non-conforming windows and siding; and that they relied on that alleged "permission." They finally assert that they relied upon the advice of their attorneys in reaching "their opinion" that "replacing the windows and siding would not be in violation of the covenants and by-laws[.]"

[¶ 26.] We first observe that, notwithstanding these assertions, Clarins do not challenge other findings that clearly support the trial court's determination that Clarins acted willfully, knowingly, and in bad faith. For example, Clarins do not challenge the court's findings that they installed non-compliant windows and siding *after* the Association notified them in writing that their requests were not approved. Clarins were also told in January 2002 that the windows they had ordered could be brought into compliance by painting. Despite the fact that two other residents in the same situation agreed to paint their windows, Clarins refused this offer. Clarins finally ignored the May 2002 Board offer to propose their own plan of compliance. We believe that under these facts, the trial court's findings are supported.

[¶ 27.] With respect to their argument of "permission," the trial court found that the Association President did not give Inez permission to use non-compliant windows and siding. Although the President did, on one occasion, say in substance, "Do what you want," the trial court found that this statement was not really permission, but a statement made "out of frustration" and only after Inez's "continued" demands. With respect to Clarins' argument that Inez was only doing what was necessary for Oliver's health, that medical condition did not require *white* windows or *steel* siding. Certainly, pewter windows and brown fir siding would have been as medically effective as white windows and steel siding. Finally, it must be remembered that the trial court had the opportunity to assess the credibility of the witnesses on each of Clarins' assertions, and Clarins fail to point to any evidence contradicting the court's credibility findings. We therefore conclude that the trial court's ultimate finding of a willful, knowing, and bad faith violation was not clearly erroneous.

### Balancing the Equities

[¶ 28.] We have held that "[t]he last factor to guide a court in issuing an injunction is the balancing of the equities, or

what is known as the 'relative hardship test.'" *Hentz v. City of Spearfish, Dept. of Pub. Works, Office of Planning & Zoning*, 2002 SD 74, ¶ 10, 648 N.W.2d 338, 341 (citations omitted). Clarins argue that "undue hardship to the Clarins clearly outweighs any claimed need for an injunction."

[¶ 29.] The trial court first concluded that "[b]ecause the Clarins' violation of the Covenants and disregard of the Board's denial of their request [ ] was willful, knowing and in bad faith, this [c]ourt need not apply the relative hardship test to determine whether to issue a mandatory injunction." This ruling most likely originated from our recognition that "[a] critical factor in balancing equities is that the party being enjoined knew that he was violating the covenant." *Id.* (citation omitted). However, we need not address the propriety of this ruling because the trial court also applied the relative hardship test. The trial court found and concluded:

> If the relative hardship test is applicable to this case, this [c]ourt finds and concludes that the hardship to be suffered by Clarins from application of the Covenants and issuance of a mandatory injunction is not disproportionate to the benefit to be gained by Brookside by enforcing the Covenants with a mandatory injunction.

[¶ 30.] In reviewing the trial court's application of this test, we first note that the foregoing finding was not specifically challenged by Clarins on appeal. Second, we agree that the hardship to be suffered by Clarins is not disproportionate to the benefit to be gained by the Association. This was a willful, knowing, and bad faith violation, and the injunction simply returns the parties to the status quo. It also ensures that the uniformity of the development will be maintained. We finally observe that Clarins' unilateral de-cision defeats the very purpose of the covenant, and although complying with the injunction will not be easy for Clarins, their burden is a result of a hardship that they could have easily prevented. We therefore find no abuse of discretion in applying the four injunction factors.

### Affirmative Defenses

[¶ 31.] Clarins further argue that the trial court erred in rejecting their affirmative defenses of laches, waiver, estoppel, unclean hands, good faith reliance, justification by necessity, misrepresentation, ostensible agency, and a Fair Housing Act defense under SDCL 20–13–20. However, Clarins failed to cite any authority for any defense except laches. Accordingly, their arguments on all of the other defenses are waived. *See supra* n3.

[¶ 32.] The only affirmative defense left for our review is laches.

> To support a determination that laches bars [Association's] action it must be found that, (1) [Association] had full knowledge of the facts upon which the action is based, (2) regardless of this knowledge, [Association] engaged in an unreasonable delay before commencing the suit, *and* (3) that allowing [Association] to maintain the action would prejudice [Clarins].

*City of Sioux Falls v. Miller*, 492 N.W.2d 116, 120 (S.D.1992) (citing *Conway v. Conway*, 487 N.W.2d 21, 24 (S.D.1992); *Golden v. Oahe Enterprises, Inc.*, 90 S.D. 263, 279, 240 N.W.2d 102, 110 (1976). *Accord Cheskey v. Cheskey*, 298 N.W.2d 180, 183 (S.D.1980)).

[¶ 33.] With respect to the windows, Clarins argue that although the Association knew that Clarins ordered, received, and installed the windows, it waited until after installation to begin its action. Clarins therefore claim "unreasonable delay"

under factors one and two. They also argue that allowing Association to maintain this action for removal of windows would cause prejudice under factor three because: (1) the costs of installation, (2) the windows cannot be removed without damage, (3) Association is not attempting to enforce the color code on the back side of the house, and (4) painting the window trim would void the warranty on the windows. With respect to the siding, Clarins argue that Association was notified by Clarins that they intended to install the siding, but Association did not commence this action until the siding was in the process of being installed. Clarins again assert that they would be prejudiced by an order requiring removal of the siding because of its cost and the cost to replace it.

[¶ 34.] The record reflects that Association commenced this action on July 31, 2002. Prior to that time, Clarins had been engaged in an ongoing debate and negotiations over the windows and siding. During the negotiation process, Clarins received a letter from the Board reiterating the Board's decision and informing them that legal action could be commenced to compel removal of the windows. After further negotiation between counsel, the Board gave Clarins a May 2002 opportunity to paint or propose their own plan of correction for the windows, but Clarins ignored this opportunity. Finally, on July 30, the same day that the Board learned that steel siding had been delivered to the site, both Clarins and their attorney were notified in writing that installation of that siding would result in Board action. The next morning, Clarins proceeded with installation, and Association's action was commenced the same day.

[¶ 35.] These facts do not demonstrate unreasonable delay in commencing suit. Much of the time that elapsed between Clarins' installation of the non-conforming windows and the commencement of this action was taken up by negotiations to resolve the matter. Furthermore, there was a pre-installation warning and no delay after the Board learned of the impending installation of the steel siding. The trial court's rejection of Clarins' laches claim was supported by the evidence.

[¶ 36.] Clarins finally argue that the covenants are ambiguous because they do not expressly require pewter window trim or brown fir siding. According to Clarins, "[r]ealistically, whether a house has white trim around the windows or pewter trim to go with the white doors and white garage doors is a ridiculous and petty demand, not worthy of commencing suit against any person." We disagree. Clarins' argument misses the point because although the covenant does not specify the exact exterior specifications, the covenants clearly require that exterior alterations (1) must be approved in writing by the Board, and, (2) may not adversely affect the harmony of appearance within the development. Clarins' unilateral action violated both requirements.

[¶ 37.] We affirm the trial court's issuance of an injunction.

[¶ 38.] **3. Whether the trial court erred in including witness fees and costs for a former Association president who testified at trial.**

[¶ 39.] Gary Reimnitz was the President of the Association at the time this action was commenced. However, he later sold his townhouse and relocated to Mitchell. Reimnitz was required to return for trial. Association, as the prevailing party, was awarded his witness fees and some cost of subsistence.

[¶ 40.] Clarins' only argument is that Reimnitz was essentially "a witness in his own case." Therefore, they challenge the

award citing *Commercial Trust and Savings Bank v. Christensen*, 535 N.W.2d 853 (S.D.1995). However, in *Christensen*, the award of witness fees and expenses was reversed because that witness merely observed the trial, and was not called to testify. *Christensen* is inapplicable to a witness who actually testified.

[¶ 41.] It is true, however, that a successful party is not entitled to witness fees for their own attendance. *See Kallis v. Beers*, 375 N.W.2d 642 (S.D.1985). Nevertheless, Reimnitz was not the successful "party" because he was no longer an officer or member of the Association. Therefore, an award of witness fees was within the discretion of the trial court.

[¶ 42.] Affirmed.[8]

[¶ 43.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and MEIERHENRY, Justices, concur.

8. Clarins also argue that they should be excused from paying Association dues and assessments because the Association paid the costs of this litigation from dues and assessments collected from all members. Therefore, Clarins characterize the *assessment* of Association *dues* as an indirect award of attorney's fees. Clarins rely upon *In re Estate of O'Keefe*, 1998 SD 92, 583 N.W.2d 138, for the proposition that, absent clear statutory authority, attorney's fees are not assessed against unsuccessful litigants. However, this rule has no application here because Clarins' complaint is over their Association dues, not any trial court award of attorney's fees. The trial court noted this distinction in declining to rule on Clarins' association dues issue. The trial court explicitly stated:

COURT: I'm not deciding issues as to whether or not she has to pay attorney's fees [through dues or assessments]. That isn't part of this suit. You're billing her for it, but that's never—you've never sued on the debt, have you?

ASSOCIATION: The covenants do not provide that a party has to pay the association fees in litigation yet. It's going to next time. She is paying—or has been expected to pay her proportionate share, 1/42 of the association fees, because she's a member of the association.

COURT: If she doesn't, then I suppose you can come back to court. I don't think it's an issue before me now.

We agree that this issue was not ripe for decision.